Wende McILWAIN, et al., Plaintiffs,

v.

Arthur Hull HAYES, Jr., Commissioner, Food and Drug Administration, Defendant.

Civ. A. No. 81–555.

United States District Court, District of Columbia.

Nov. 4, 1981.

Katherine A. Meyer, William B. Schultz and Alan B. Morrison, Washington, D. C., for plaintiffs.

Asst. U. S. Atty. Patricia J. Kenney, Civ. Div. and Margaret Cotter, Asst. Chief, Antitrust Div., Dept. of Justice, Washington, D. C., for defendant.

Thomas A. Guidoboni, Daniel R. Thompson, Mark W. Smith, Bonner, Thompson, O'Connell, Gaynes & Middlekauff, Washington, D. C., for defendant-intervenor Certified Color Manufacturers Assn.

Robert M. Sussman, Ellen J. Flannery, Covington & Burling, Washington, D. C., for defendant-intervenor Cosmetic, Toiletry and Fragrance Assn.

## MEMORANDUM

FLANNERY, District Judge.

This matter is before the court on cross-motions for summary judgment. Approximately four years ago, a similar group of plaintiffs[1] brought before this court a similar challenge to actions taken by the Commissioner of the Food and Drug Administration (hereinafter "FDA"). *See Health Research Group v. Califano,* No. 77–293 (Sept. 23, 1977) (memorandum opinion). At that time this court decided on the basis of both the administrative record before it and the broad discretion granted to the FDA by the statute that the Commissioner's actions were lawful and that the defendants were entitled to summary judgment. For the reasons discussed below, the result is the same in this case.

## FACTS

Plaintiffs in this action seek declaratory and injunctive relief from certain actions taken by the FDA pursuant to the Color Additive Amendments. 21 U.S.C. § 376. In these Amendments Congress established two systems under which the FDA could list color additives for general use. First,

---

1. In fact, Public Citizen, one of the plaintiffs in    this case, was a plaintiff in this earlier case.

and most important, Congress established the general rule that no color additive could be permanently listed for use unless it had been established, to the FDA's satisfaction, that the particular additive was safe. 21 U.S.C. §§ 376(a)&(b). This decision shifted the burden to industry to establish the safety of any additives proposed for use in the public at large.[2] 21 U.S.C. § 376(b). Second, recognizing the great amounts of time and effort required to establish safety and not wanting to deprive the public of the useful benefits of these additives[3] while waiting for industry to meet this burden, Congress provided a scheme for provisional listing which applied to all additives then in use that did not pose health risks. 21 U.S.C. § 376 (note—section 203(a)(1)(B)). Any such provisional listing was to last for two and one-half years, unless the Commissioner decided that an extension of the provisional listing was justified. *Id.* at section 203(a)(2). The Amendments gave the Commissioner broad discretion to grant extensions. Once the provisional listing for any given additive ends, then the FDA must decide whether the additive should be permanently listed. If industry cannot satisfy the burden of establishing the additive's safety at this point, then the additive will not be permanently listed and it will no longer be available for use.

In the case at bar, plaintiffs specifically challenge the FDA's decision to extend, for varying amounts of time,[4] the provisional listings of twenty-three color additives. As a result of a number of previous FDA extensions of provisional listing status, the last of which was the extension challenged before this court four years ago, the provisional listings for all twenty-three of these

additives was scheduled to end on January 31, 1981. After determining that a further extension of provisional listing was necessary to allow for both the completion of ongoing scientific testing and the evaluation of the data resulting therefrom,[5] the Commissioner on November 4, 1980, published a proposed rule in the Federal Register notifying the public that he intended to extend the provisional listings of these twenty-three additives beyond the January 31 closing date. 45 Fed. Reg. 75226 (1980).

Comments on this proposal were received and evaluated by the FDA. After evaluating all the relevant evidence, a final notice of extension was to be promulgated and published by the FDA before the January 31 closing date; this never occurred, however, because on January 29, 1981, President Reagan issued a memorandum postponing the publication of all final rules for sixty days. *See* 46 Fed. Reg. 11227 (1981). Believing its final notice of extension to be prohibited by this memorandum, the FDA did not publish the final notice of extension until it received special clearance to do so from the Office of Management and Budget. As a result, the final rule extending the provisional listings for these twenty-three additives was not published until March 27, 1981, approximately two months after the closing date for the provisional listings. 46 Fed. Reg. 18954 (1981).

### DISCUSSION

I. Effect of the Delay in Publishing the Final Notice of Extension

■ Plaintiffs' first challenge to the Commissioner's extension of these twenty-

---

**2.** Prior to the passage of the Amendments, the burden was on the government to perform testing to show that use of a given color additive was harmful. *See* Federal Food, Drug and Cosmetic Act of 1938, Sections 406(b), 504 & 604, 52 Stat. 1049, 1052 & 1055 (1938).

**3.** For example, the drug industry uses many of these colors as an identification tool for different drug capsules, tablets, and liquids. Unavailability of the colors could lead to inadvertent misuse of drug products resulting in possible adverse consequences to consumers.

**4.** Final FDA action is currently scheduled to occur for twelve of the color additives during 1982, for nine of the color additives during 1983, and for the final two color additives during 1984.

**5.** Testing on some of the additives has already been completed. By the end of 1981, testing on all but one of the color additives is to be completed.

three provisional listings is a syllogistic attack based upon the untimely publication of the final notice of extension. Plaintiffs' argument runs along the following lines:

1) a provisional listing lasts until its closing date, unless the FDA postpones the closing date,

2) the closing date for the twenty-three provisional listings in this case was January 31, 1981,

3) no final notice of extension or postponement was published by the FDA prior to the closing date, hence the provisional listings for these twenty-three additives expired,

4) since the provisional listings expired, the color additives at issue could only be relisted for use on the basis of a permanent listing decision.

As noted above, requiring the FDA to relist the additives according to "permanent listing" criteria would have a tremendous impact upon the decision-making process regarding these additives.

Plaintiffs' argument possesses some attractiveness and cannot be given short shrift. For example, the Color Additive Amendments themselves provide that:

A *provisional listing* of a color additive under this section for any use *shall*, unless sooner terminated or expiring under the provisions of this section, *expire* (A) *on the closing date* (as defined in paragraph (2) of this subsection) or (B) on the effective date of a listing of such additive for such use under section 706 of the basic Act [i.e. permanent listing], whichever date first occurs.

(2) For the purposes of this section, the term *"closing date" means* (A) the last day of the two and one-half year period beginning on the enactment date or (B) with respect to a particular provisional listing of a color additive or use thereof, *such later closing date as the Secretary may from time to time establish* . . . .

21 U.S.C. § 376 (note—section 203(a) (1)&(2)) (emphasis supplied). The nub of the argument is that since the provisional listings had expired already, it was impossible for the Commissioner by the order of March 24 to extend those listings. One cannot extend what does not exist.

The FDA's response to this argument basically maintains that the Presidential memorandum was an exceptional circumstance that should not be viewed as having abridged any substantial rights, such as the FDA's right to extend provisional listings in the public interest.

[T]he fact that the agency was prevented from extending the closing date of the provisional list in a timely manner because that closing date, established over 3 years ago, happened to coincide with a Presidential directive not to issue new regulations, provides no basis for not continuing to make these color additives available.

46 Fed. Reg. 18955 (1981).

Although the President's memorandum can certainly be viewed as an exceptional circumstance, it is not altogether clear that the FDA was correct in considering itself bound by the memorandum. For example, the President's memorandum did provide for some exceptions from its strictures:

3. *Emergency Regulations and Regulations Subject to Short-Term Deadlines.* Your agency shall not postpone regulations that respond to emergency situations or for which a postponement pursuant to this memorandum would conflict with a statutory or judicial deadline.

17 *Weekly Comp. of Pres. Doc.* 73–74 (Feb. 10, 1981). Arguably, the pending closing date for the twenty-three provisional listings could have been considered a statutory deadline thereby bringing publication of the final notice within this exemption.

Although plaintiffs' argument is logically consistent and although the FDA's strict adherence to the Presidential memorandum may have been misplaced, nonetheless requiring the FDA to make a permanent listing decision on all twenty-three additives at this time because of the failure to timely publish the extension notice would be unduly harsh and not in the public interest. First, carried to its logical conclusion, plaintiffs' argument is that once the January 31 deadline passed, for whatever reasons, the

FDA was forever barred from extending a provisional listing. Such an assertion, however, is clearly inconsistent with the general purpose and approach of the Color Additive Amendments and if followed would thwart Congress' intention of allowing the FDA, in its discretion, to continue the use of certain color additives on a provisionally listed basis. *Cf. United States Steel Corp. v. United States Environmental Protection Agency,* 595 F.2d 207, 213–14 n.14 (5th Cir. 1979) (rejecting similar argument in context of bypassed EPA deadline).

Second, plaintiffs have not made, and are probably unable to make, any showing of prejudice to them by the untimely extension of the provisional listings. Because the FDA published a proposed rule on November 4, 1980, plaintiffs had ample time both to participate in the rulemaking process[6] and to take any other action with regard to the extension that they might have found necessary. *See British American Commodity Options Corp. v. Bagley,* 552 F.2d 482, 489 (2d Cir. 1977). Indeed if anyone was prejudiced by the delay it was undoubtedly the defendants.[7]

Finally, the validity of plaintiffs' argument depends upon an unusually strict interpretation of the Amendments' definition of expire. *See* 21 U.S.C. § 376 *supra* at 975 (containing definition). Such an interpretation, however, is undercut by a further section of the Act. Section 203(d)(2)(c) of the Amendments gives the Commissioner the power upon well-founded objections being taken to any of his decisions, to order the reinstatement of a terminated provisional listing. It therefore appears that a technical expiration under the terms of the statute does not necessarily constitute the death-knell of a provisional listing; thus, plaintiffs' overly strict interpretation is not compelled by the statute itself. For all the above-noted reasons, the policies underlying the Color Additive Amendments would not be served by adopting plaintiffs' strict-constructionist argument on the facts of this case, where the Commissioner of the FDA fully intended all along that these twenty-three provisional listings were to be extended.

## II. Review of the Commissioner's Decision

Having cleared the hurdle of technical, procedural objections to the Commissioner's extension of these twenty-three provisional listings, the court must now proceed to a substantive review of that decision. Two principles from this court's decision four years ago still control this review process.

■ First, the Color Additive Amendments gave the Commissioner broad discretionary powers in this area of extending provisional listings. *Health Research Group* at 4.

[T]he statutory authority to grant a postponement is couched in broad, discretionary language and allows for the interplay of judgmental factors. While the statute speaks in terms of completing the necessary "scientific investigations" there is also a pervasive legislative gloss that the postponement must also be consistent with the protection of the public health.

*Certified Color Manufacturers Association v. Mathews,* 543 F.2d 284, 294 (D.C. Cir. 1976). Extending the closing date for a provisional listing must, therefore, be consistent with the Commissioner's statutory mandate to protect the public health.

■ Second, because the Commissioner has this broad discretion the scope of this court's review of his decision is very narrow.[8] *Certified Color Manufacturers Asso-*

6. Indeed some of the plaintiffs did comment on the proposed rule, but their comments did not convince the Commissioner to alter his proposal. *See* 46 Fed. Reg. 18955 (1980).

7. In actuality, however, even the defendants were not prejudiced because the Commissioner informed them, by letters of February 2, of exactly what had occurred and that no legal action would be taken against them pending publication of the final notice of extension.

8. In the case at bar, plaintiffs argue that the Commissioner has somewhat circumscribed his broad discretion in this area, and thereby subjected his decision to a more searching scrutiny by this court, by publishing certain statements in the preamble to the final rule granting the

*ciation*, 534 F.2d at 293; *Health Research Group* at 4. This court must presume the validity of the Commissioner's action until and unless the plaintiffs can show that there was no rational basis for the Commissioner's decision. *Id.; id.* This court cannot substitute its judgment for the Commissioner's, but rather must restrict its inquiry to whether there was a rational nexus between the facts found and the choices made by the Commissioner. *Id.* at 293–94; *id.* Thus the real issue is whether the Commissioner exercised his discretion in an arbitrary and capricious manner. *Health Research Group* at 4.

The Commissioner found the extensions in this case to be justified on the basis of certain delays that had occurred and which made it impossible for the testing and evaluation of these additives to be completed by the January 31 closing date. These delays fall into the following categories: 1) development of testing protocols or procedures, 2) obtaining testing facilities, 3) determination of appropriate dosage levels to be fed to the mice and rats, 4) shortage of certified batches of the necessary color additives, and 5) laboratory delays, which were caused by a combination of a) a shortage of trained pathologists and b) the tremendous volumes of tissue that had to be examined after the tests were completed. Although some of these delays may seem to be in areas where no delay should exist, (i.e. development of test procedures and determination of appropriate dosage levels), it must be noted that the tests initiated after this court upheld the FDA's last provisional listing extension in 1977 were unique tests involving the chronic feeding of rats and mice; these tests had never been tried before in this

area. As such a number of the delays were merely the result of the normal factors of trial and error in the laboratory.

Plaintiffs attack these delays on the grounds that the problems were foreseeable and thus the delays should have been avoided. These allegations are made, however, with the benefit of hindsight; the Commissioner expressly found that no delay was the result of bad faith, but instead that the failure to have everything completed by the January 31 closing date was the result of: 1) the newness of the tests themselves, 2) unforeseeable, unavoidable, normal human mistakes, 3) the shortage of both laboratories large enough to handle this type of testing and trained pathologists, and 4) the FDA's having been unrealistic in originally setting the January 31 closing date (i.e. the Commissioner admits that it was a date that allowed no room for error of any type).

■ After reviewing both parties claims, it appears that the Commissioner's findings were clearly reasonable and well-supported by the facts in this case. Plaintiffs have demonstrated no willful or bad-faith delay. Instead, plaintiffs' allegations attack the defendants because everything did not work perfectly and because the tests were not completed as fast as humanly possible; the statute, however, only requires the Commissioner to ensure that testing is completed "as soon as *reasonably* practicable." In this case, the Commissioner clearly found both that there were reasons for the delays that had occurred and that there was good reason for allowing the present extensions. This court holds that these findings by the Commissioner are neither arbitrary nor irrational.

last extension of these provisional listings. In that preamble the Commissioner declared:

In the unlikely event that unforeseen and unavoidable circumstances arise to make compliance with the requirements of the final regulation virtually impossible, the Commissioner will consider requests for brief extensions of the closing dates. The Commissioner cautions, however, that such requests will be considered only if "extraordinary circumstances" exist and maximum effort has been given to meeting the deadlines.

42 Fed. Reg. 6998 (1977). Plaintiffs maintain that these statements provide the legal standard by which the Commissioner's actions should be judged. These statements, however, are appropriately viewed at most as an advisory opinion, *see* 21 C.F.R. § 10.85(d) (1977–1980), and can in no way be viewed as binding the Commissioner to follow the described standards in a court of law. *See* 21 C.F.R. § 10.-85(j). However, even assuming *arguendo* that this was the appropriate standard, it has been met on the facts of this case.

The present extensions are to allow the completion and evaluation of the tests that this court allowed by upholding the Commissioner's extensions four years ago.[9] In light of all the time, money and effort which has already been put into this testing by the defendants over the past four years, such extensions appear extremely reasonable. Further, denying these extensions would force the FDA to make decisions on permanently listing these twenty-three additives before the agency had all the relevant evidence before it, evidence which at this point is not far from the FDA's grasp; such peremptory action would hardly be in the public interest. *See* Health Research Group at 6.

Because there has been no statutory violation by the FDA in this case, the court declines to undertake any alteration of the FDA's extension schedule; "[w]here there has been no violation of a statutory duty, we think the proper course is to confine ourselves to a declaration of the intent of Congress and to give the [Commissioner] latitude to exercise his discretion ...." *Natural Resources Defense Council, Inc. v. Train*, 510 F.2d 692, 711–12 (D.C. Cir. 1975); *see Antone v. Block*, 661 F.2d 230 at 234 (D.C. Cir. 1981) (unless timetable shown to be arbitrary, irrational, unconstitutional, or contrary to statute, the court must defer to agency determination of proper implementation schedule). The instant staggered extension schedule established by the FDA is both well-supported by the facts and completely reasonable.[10]

An appropriate Judgment accompanies this Memorandum.

## JUDGMENT

This matter came before the court on cross-motions for summary judgment. After hearing oral argument, and after considering all the arguments in the memoranda, affidavits and materials submitted by the parties, it is, by the court, this 4th day of November, 1981,

ORDERED, ADJUDGED and DECREED that plaintiffs' motion for summary judgment is hereby denied; and it is further

ORDERED, ADJUDGED and DECREED that defendants' motion for summary judgment is granted.

---

**9.** On its face, that extension to allow the initiation of new testing involved an arguably more difficult issue than the present extension to allow completion of testing already underway.

**10.** In their proposed alterations to the FDA's schedule, plaintiffs argue that the current schedules' grant of one year to the FDA to review the final report submitted on each color additive and to make a final decision regarding permanently listing the additive is plainly unreasonable considering that in every previous extension of provisional listings the FDA had only been allotted a six-month review period. *See* Memorandum In Support Of Plaintiffs' Proposed Schedule For Termination Of The Provisional List at 6. The court finds that the Commissioner has adequately justified such an ex-

tension of the agency's review period by noting the unexpectedly large amount of data and material which has been produced by the testing and will have to be reviewed by the agency. Further, allowing this extension of the agency review period to be incorporated into the schedule at this point will hopefully speed achievement of the ultimate goal "by obviating the need for time-consuming corrective measures at a later date." *See Natural Resources Defense Council, Inc. v. Train*, 510 F.2d at 712. This court strongly hopes that no further corrective measures will be required before the termination of this *provisional* list, which Congress originally sanctioned over twenty years ago.