**Wende McILWAIN, et al., Appellants,**

v.

**Arthur Hull HAYES, Jr., Commissioner, Food and Drug Administration, et al.**

No. 81–2204.

United States Court of Appeals, District of Columbia Circuit.

Argued May 25, 1982.

Decided Oct. 19, 1982.

---

Katherine A. Meyer with whom William B. Schultz, Washington, D.C., was on the brief for appellants.

Stephen F. Ross, Atty., Dept. of Justice, Washington, D.C., for appellee, Hayes, Com'r, Food and Drug Admin., John J. Powers, III and Mark C. Del Bianco, Attys., Dept. of Justice, Washington, D.C. and Donald O. Beers, Associate Chief Counsel, Food and Drug Admin., Rockville, Md., were on the brief, for appellee, Hayes, Com'r, Food and Drug Admin. Robert B. Nicholson, Atty., Dept. of Justice, Washington, D.C., also entered an appearance for appellee, Hayes, Com'r, Food and Drug Admin.

Robert M. Sussman, with whom Ellen J. Flannery, Washington, D.C., was on the brief, for appellee, Cosmetic, Toiletry and Fragrance Ass'n.

Thomas A. Guidoboni with whom Daniel R. Thompson and Mark W. Smith, Washington, D.C., were on the brief, for appellee, Certified Color Manufacturers' Ass'n.

Before MIKVA and BORK, Circuit Judges and JAMESON,* United States Senior District Judge for the District of Montana.

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

Opinion for the Court filed by Circuit Judge BORK.

Dissenting opinion filed by Circuit Judge MIKVA.

BORK, Circuit Judge:

Prior to 1960, color additives used in foods, drugs, and cosmetics could be marketed lawfully unless the Food and Drug Administration ("FDA") tested them and found them unsafe. Because of the FDA's limited resources, Congress believed this testing process likely to be unduly prolonged. In 1960, therefore, the Color Additive Amendments to the Food, Drug, and Cosmetic Act shifted the burden of testing and proof of safety to industry. A color additive is to be deemed unsafe unless industry proves its safety. Recognizing that this would take time with many commercially established additives, Congress provided a grace period of two and one-half years. Additives undergoing testing were to be provisionally listed as available for use. If proven safe, they were to be permanently listed. If not proven safe, the additives were, of course, to be removed from the market.

The present case involves a dispute over the extent and exercise of the power Congress gave the Commissioner of the FDA to postpone the time (the "closing date") by which proof of safety was to be required or the additive delisted and removed from the market. While some additives have been proven safe and permanently listed for use and others have not been proven safe and have been removed from the market, the twenty-three additives in question here have been on the market under provisional listings for over twenty years. The Commissioner of the FDA has repeatedly postponed the closing dates for proof of their safety. On November 4, 1980, the FDA published a proposed rule announcing an intention once more to postpone the closing dates from January 31, 1981, for periods ranging from one to three and one-half years for the various additives. Appellants

challenge this latest round of postponements, contending that the Commissioner lacks the authority to keep drugs not yet proven safe on the market for so many years or that, if he has such authority, he has abused his discretion.

We hold that the Commissioner's latest extensions for proving the safety of these color additives are within his lawful authority and discretion. Undoubtedly, in 1960 many members of Congress anticipated that color additive testing would be completed more rapidly than has been the case with respect to some additives. Just as certainly, however, Congress foresaw that unavoidable delays were possible and provided a statutory mechanism for the Commissioner to cope with such problems. Most significantly, for the issues in this case, Congress provided no limit upon the number of times postponements could be made. The primary reason for the repeated postponements here is that testing technology has evolved and improved so rapidly that, by the time a color additive has been shown to be safe under one series of tests or is still undergoing testing, more sophisticated testing procedures have been devised and the Commissioner orders that the time-consuming testing process begin anew.

It is important to realize what "proving" safety necessarily means. A color additive is subjected to the best tests available and safety is assumed to be shown if no evidence of harm to health is found. We are informed by the Commissioner that no test data supplied so far indicate any problem with the safety of the twenty-three color additives involved here, and it is only the fact that new, more rigorous tests have since become available that makes it possible to say that these products have not yet

1. The Color Additive Amendments vest authority in the Secretary of Health, Education, and Welfare (now Health and Human Services), who has delegated his duties under the Amendments to the Commissioner of the FDA. *See* 21 C.F.R. § 5.10 (1982). All references will be to the Commissioner.

2. In *Certified Color Mfrs. Ass'n v. Mathews*, 543 F.2d 284, 286–87 (D.C.Cir.1976), this court stated that the Color Additive Amendments

been conclusively demonstrated to be safe. Under these circumstances, we think it both reasonable and within the express powers conferred upon him by Congress for the Commissioner to postpone the closing dates for the color additives in question. We therefore affirm the judgment of the district court.

BACKGROUND

*The Statutory and Administrative Framework*

Under the 1960 Color Additive Amendments to the Food, Drug, and Cosmetic Act, a color additive is deemed unsafe unless and until the Commissioner permanently lists such additive by regulation upon a finding that it is safe for its intended use. 21 U.S.C. § 376(a) (1976).[1] The burden rests with industry to test the color additive and establish its safety to the satisfaction of the Commissioner. 21 U.S.C. § 376(b).[2]

Congress recognized that the necessary testing could not be done instantaneously and so provided a statutory mechanism for a transitional period. Commercially established color additives were permitted to remain on the market for two and one-half years while the industry completed safety testing. Should this period prove inadequate, section 203(a)(2) of the transitional provisions gave the Commissioner discretion to postpone, "from time to time," the closing date

with respect to a provisional listing ... for such period or periods as he finds necessary to carry out the purpose of this section, if in the [Commissioner's] judgment such action is consistent with the objective of carrying to completion in

reflect a Congressional and administrative response to the need in contemporary society for a scientifically and administratively sound basis for determining the safety of artificial color additives, widely used for coloring food, drugs, and cosmetics. The Amendments reflect a general unwillingness to allow widespread use of such products in the absence of scientific information on the effect of these products on the human body. [footnotes omitted]

good faith, as soon as reasonably practicable, the scientific investigations necessary for making a determination as to listing such additive . . . .[3]

In both 1971 and 1977 the Commissioner determined that scientific standards had changed sufficiently to require new tests although the tests already administered had produced no evidence of unsafety. These tests were the best available at the time they were mandated. In 1971, the Commissioner extended the provisional listings so that all ingested colors could be tested for teratology and reproduction effects. 36 Fed.Reg. 3806 (1971). Five years later the Commissioner found that chronic toxicity studies of thirty-one color additives performed in the 1960's were deficient when judged by the scientific standards of 1976. 41 Fed.Reg. 41,860, 41,863 (1976). He directed industry to conduct a second generation of chronic toxicity studies. 42 Fed. Reg. 6992 (1977).

The Commissioner stated that "[t]he available studies do not show any adverse effects associated with use of any of the 31 color additives under their intended conditions of use." 41 Fed.Reg. at 41,863. The inadequacies of the studies available in 1977, the Commissioner pointed out in the preamble to the proposed rule, were not "the result of inherent defects in the studies or failures to conduct them competently[,]" but rather were "attributable to the dynamic and ever-improving scientific techniques for testing" these color additives. *Id.*[4] He therefore postponed the closing dates for all of the twenty-three additives for nearly four years to January 31, 1981.

The regulations imposed upon industry and FDA alike the duties of conducting the necessary testing and data evaluation within strict time limits.[5] Acknowledging that these time limits would require both agency and industry to give the project the highest priority, the Commissioner declared:

In the unlikely event that unforeseen and unavoidable circumstances arise to make compliance with the requirements of the final regulation virtually impossible, the Commissioner will consider requests for brief extensions of the closing dates. The Commissioner cautions, however, that such requests will be considered only if "extraordinary circumstances" exist and maximum effort has been given to meeting the deadlines.

42 Fed.Reg. at 6998.

Some of the appellants in the present case brought a suit to challenge the Commissioner's 1977 decision to extend the closing dates, arguing that the transitional pro-

3. The stated purpose of the transitional provisions was

to make possible, on an interim basis for a reasonable period, through provisional listings, the use of commercially established color additives to the extent consistent with the public health, pending the completion of the scientific investigations needed as a basis for making determinations as to listing of such additives . . . .

Section 203(a)(1) of the transitional provisions, 21 U.S.C. § 376 note.

4. In the preamble to the Commissioner's 1977 final rule, the Commissioner explained that "[t]hree factors—the time needed to do studies on the additives, a legal challenge to FDA authority over cosmetic ingredients, and changing scientific standards for the evaluation of food and color additives—account largely for the delay." 42 Fed.Reg. 6992 (1977).

5. The chronic toxicity and multigeneration reproduction studies required by 21 C.F.R. § 81.-27(d), (e) (1982) are complex and time-consuming. For example, the *in uterro* chronic feeding study required by the FDA involves dietary exposure of parental rats to the color additive prior to and during mating, gestation, parturition and lactation, followed by 30-month dietary exposure of the offspring at the same dose level. Brief for Appellee Certified Color Manufacturers' Association at 24 n.1. CCMA estimates that it must examine nearly a quarter of a million tissues in its rat, mouse, and multigeneration reproduction studies. *Id.* at 28–29. The Cosmetic, Toiletry, and Fragrance Association estimated in its petition for postponements that at a minimum its studies would require ten pathologist man years. CTFA Petition at 8, Joint Appendix 48. Moreover, CTFA estimated that the raw data generated from its necessary studies comprise hundreds of thousands of pages. CTFA Petition at 8–9, Joint Appendix 48–49. For more extensive discussions of the nature of the testing and review process, see the petitions of CCMA and CTFA for postponements filed before the FDA, Joint Appendix 41–73 (CTFA), 78–101 (CCMA). In their brief appellants do not controvert these claims.

visions authorized extensions only where necessary to complete on-going studies. The district court held the Commissioner's action to be well within his authority. *Health Research Group v. Califano,* Civ. Action No. 77–293 (D.D.C. Sept. 23, 1977). Plaintiffs withdrew their appeal after the FDA entered into a stipulation agreeing, among other things, to make available to the public progress reports, evaluations of such reports, and applications for extensions of closing dates.

The FDA now concedes that the studies the agency required industry to make could not be completed within the time period provided in 1977. Brief for Defendant-Appellee Hayes at 10. In early 1980, three industry sponsors, including the Certified Color Manufacturers Association ("CCMA") and the Cosmetics, Toiletry and Fragrance Association ("CTFA"), who are also appellees here, petitioned for further postponements. On November 14, 1980, the Commissioner proposed to postpone the closing dates of twenty-three color additives, citing four factors causing "unforeseen and unavoidable delays": (1) the additional time required for the approval of the necessary scientific protocols and dosage levels; (2) the FDA's decision to raise the maximum dose level for many of the additives in the course of testing, requiring industry to start over; (3) laboratory delays, due to the shortage of facilities and personnel; and (4) shortages of color additives in the course of testing. 45 Fed.Reg. 75,227 (1980).

The final rule, published on March 27, 1981, postponed the closing dates for each of the twenty-three additives from one to three and one-half years, the last closing date being September 30, 1984. 46 Fed. Reg. 18,954. Each closing date is one year after the final report on the additive is due from the industry sponsor. *Id.* at 18,957. The FDA concluded:

> [I]ts review of progress reports on each color under test demonstrates that there continues to be no public health or safety concerns with any of the 23 color additives. Thus, extension of the provisional

list is consistent with FDA's statutory mandate to protect the public health. *Id.*

*The Posture of This Litigation*

Appellants, plaintiffs below, are two individuals and two organizations called Public Citizen and the Center for Science in the Public Interest. Appellees, defendants below, are the Commissioner of the FDA, and the two intervenor trade associations, CCMA and CTFA. Appellants advance two arguments: (1) the statute's transitional provisions do not permit the Commissioner to grant postponements of closing dates so many times that color additives not proven safe remain on the market for more than twenty years; and (2) if the statute does grant the Commissioner that authority, his latest postponements are abuses of discretion because the delays in the completion of testing were foreseeable and avoidable.

In the district court, the parties filed cross-motions for summary judgment. The court granted the Commissioner's motion, holding that the Commissioner had the statutory authority to grant the challenged postponements and had not abused his discretion in doing so. The court said:

> [P]laintiffs' allegations attack the defendants because everything did not work perfectly and because the tests were not completed as fast as humanly possible; the statute, however, only requires the Commissioner to ensure that testing is completed "as soon as *reasonably* practicable." In this case, the Commissioner clearly found both that there were reasons for the delays that had occurred and that there was good reason for allowing the present extensions. This court holds that these findings by the Commissioner are neither arbitrary nor irrational.

*McIlwain v. Hayes,* 530 F.Supp. 973 at 978 (D.D.C.1981) (emphasis in original). The district court refused to disturb the FDA's extension schedule, as plaintiffs had requested, adding that the agency's timetable "is both well-supported by the facts and completely reasonable." *Id.* at 979.

This appeal followed.

### DECISION

This case is controlled by the plain meaning of sections 203(a)(1) and (2) of the Color Additive Amendments' transitional provisions.[6] The purpose of the transitional mechanism is to allow provisional listings of commercially established color additives "on an interim basis for a reasonable period . . . to the extent consistent with the public health" pending the completion of the required scientific investigations. To effectuate that purpose, Congress provided for provisional listings for two and one-half years from the date of enactment or "such later closing date as the [Commissioner] may from time to time establish . . . ." The Commissioner may postpone a closing date "of a specified color additive . . . for such period or periods as he finds necessary to carry out the purpose of this section, if in the [Commissioner's] judgment" that is consistent with completing the scientific investigations "in good faith, as soon as reasonably practicable . . . ."

It will be observed that the statute sets no limit upon the number of extensions the Commissioner may grant. Indeed, by using the phrases "from time to time" and "period or periods" in connection with a single, specified additive, it is manifest that Congress contemplated and provided for multiple postponements. The statute also sets no time limit upon provisional listings, a fact that is particularly significant since Congress has set such time limits in analogous statutes.[7]

6. These sections provide:

Sec. 203. [Provisional Listings of Commercially Established Colors.]

(a)(1) The purpose of this section is to make possible, on an interim basis for a reasonable period, through provisional listings, the use of commercially established color additives to the extent consistent with the public health, pending the completion of the scientific investigations needed as a basis for making determinations as to listing of such additives under the basic Act as amended by this Act. A provisional listing (including a deemed provisional listing) of a color additive under this section for any use shall, unless sooner terminated or expiring under the provisions of this section, expire (A) on the closing date (as defined in paragraph (2) of this subsection) or (B) on the effective date of a listing of such additive for such use under section 706 of the basic Act [this section], whichever date first occurs.

(2) For the purposes of this section, the term "closing date" means (A) the last day of the two and one-half year period beginning on the enactment date [July 12, 1960] or (B), with respect to a particular provisional listing (or deemed provisional listing) of a color additive or use thereof, such later closing date as the Secretary may from time to time establish pursuant to the authority of this paragraph. The Secretary may by regulation, upon application of an interested person or on his own initiative, from time to time postpone the original closing date with respect to a provisional listing (or deemed provisional listing) under this section of a specified color additive, or of a specified use or uses of such additive, for such period or periods as he finds necessary to carry out the purpose of this section, if in the Secretary's judgment such action is consistent with the

objective of carrying to completion in good faith, as soon as reasonably practicable, the scientific investigations necessary for making a determination as to listing such additive, or such specified use or uses thereof, under section 706 of the basic Act [this section]. The Secretary may terminate a postponement of the closing date at any time if he finds that such postponement should not have been granted, or that by reason of a change in circumstances the basis for such postponement no longer exists, or that there has been a failure to comply with a requirement for submission of progress reports or with other conditions attached to such postponement. 21 U.S.C. § 376 note.

7. See section 107(c)(3)(B) of the Drug Amendments of 1962, Pub.L.No. 87–781, 76 Stat. 780, which made it unlawful to market, two years after enactment of the statute, any drug for which there was a lack of substantial evidence of effectiveness. Congress provided for a grace period of two years but did not grant the Commissioner authority to extend this period. In *American Public Health Ass'n v. Veneman,* 349 F.Supp. 1311 (D.D.C.1972), the district court held unlawful the FDA's attempt to permit continued marketing of the drugs beyond the grace period while industry gathered evidence of a drug's efficacy. The 1962 Drug Amendments also made it unlawful to market a drug without FDA approval, after a two-year grace period, unless the drug was recognized as safe and effective. In *Cutler v. Kennedy,* 475 F.Supp. 838 (D.D.C.1979), the district court held unlawful FDA's Category III regulation which had allowed drugs not yet established as safe and effective to remain on the market past the grace period while industry performed further testing. The court stated that under the 1962 Drug Amendments, "*[t]here are . . . no interim*

Congress has constrained the Commissioner's discretion in granting postponements in several respects only. Such postponements must be consistent with the public health, and the Commissioner must judge that the scientific investigations are going forward in good faith and will be completed as soon as reasonably practicable.

Appellants' argument that the Commissioner lacks statutory authority to grant these latest postponements is somewhat difficult to comprehend. The argument does not deny that the Commissioner was given power to postpone closing dates but seems to suggest that the statutory authority has somehow lapsed. Thus appellants state:

> While there may have been a legal basis in the past for extending the provisional list, it is plaintiffs' position that, more than 20 years after the statute's enactment, the FDA no longer has the authority to use the provisional list as a device to allow color additives which have not been proven safe to continue to be sold to the public.

Brief for Appellants at 20.

The only conceivable basis for this argument is the statement in the statute that provisional listings are to be "on an interim basis for a reasonable period." But a "reasonable period" is defined as the time needed to complete the necessary scientific investigations. Here it appears that much of the delay has been caused by rapidly improving testing procedures so that additive sponsors have had to test and retest. Tests that reflected the best scientific standards when undertaken with FDA approval do not satisfy the more rigorous standards that

have since become available. The FDA has been receiving data from the tests done and states that it will end the provisional listing of any additive should test data indicate any safety problem. The Commissioner is given complete power to terminate a provisional listing or a postponement of a closing date whenever he believes that such listing or postponement was mistaken or that any danger to public health appears.[8]

It appears that many and perhaps all of the additives in question here would have been permanently listed as proven safe if the state of testing technology had remained as it stood when testing first began.[9] Only the constant advance of that technology has produced this situation in which additives are tested and retested and now must be tested again. It may be doubted that Congress foresaw that the very advance of science would delay the completion of testing for so long, but it did foresee the possibility of delays well beyond the initial two and one-half year transitional period, and it empowered the Commissioner to use provisional listings to cope with just such unanticipated problems. Under these circumstances, we cannot say that his statutory power has somehow lapsed. To do so would require a judicial amendment of the statute's plain language. We may assume that Congress did not anticipate a delay of more than twenty years in completing the testing of some additives. Indeed, appellants cite statements in the legislative history indicating that the reason for shifting the burden of testing from the FDA to industry was that such testing

---

*provisions* under which safe, but only potentially effective drugs can be marketed pending testing." 475 F.Supp. at 854 (emphasis added). In the Color Additive Amendments there are, of course, precisely such interim provisions that the court found lacking in *Cutler* and *Veneman.*

**8.** Sections 203(d)(1)(E) (Commissioner may terminate a provisional listing "forthwith whenever in his judgment such action is necessary to protect the public health") and 203(a)(2) (Commissioner may terminate a postponement of a closing date "at any time if he finds that," *inter alia,* "such postponement should not have been granted, or that by reason of a change of cir-

cumstances the basis for such postponement no longer exists ...."). These sections are integral parts of the transitional provisions, 21 U.S.C. § 376 note.

**9.** CTFA states that "substantial testing was conducted on all 23 colors during the 1960s and 1970s. If the 23 colors were evaluated against the scientific standards that prevailed when this testing was performed, the Agency would have had no choice but to grant permanent listing since the test data uniformly showed that the colors are safe." Brief for Appellee Cosmetic, Toiletry and Fragrance Association at 25 n.1.

might take the FDA twenty years.[10] There are also in the legislative history indications that Congress understood that testing might prove to be an extended and laborious process even with the testing resources available to industry.[11] The fact is that Congress knew it was dealing with a situation whose development neither it nor experts in the field of testing could confidently predict, and there is nothing in the legislative history that even remotely calls into question the existence of the powers given to the Commissioner by the unambiguous language of the statute. *See United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981); *Consum-*

*er Product Safety Commission v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980).

What we have said so far about the Commissioner's statutory authority also largely disposes of the challenge to the exercise of his discretion. Appellants do not contest that the major reason for the length of the provisional listings here is the advance of scientific standards. Nor do they deny that the enormous amount of data submitted to the FDA under testing already done fails to show any evidence that these color additives are not safe.[12] Their argument that the Commissioner has abused his discretion is, in fact, fairly characterized as little more

10. *See* 106 Cong.Rec. 14,350 (1960) (remarks of Representative Delaney):

It is vitally important for the protection of the consumer that the producer of a dye be required to test it for safety before permitting its introduction into our foods, drugs, or cosmetics. The Food and Drug Administration simply does not have the facilities or the staff to test all the colors proposed for use.... FDA figures that it would take 20 years to complete the retesting program. During that time the public would have to run the risk of daily exposure to dyes which have not been clearly proven to be safe. This cannot be justified on any grounds.

11. *See Color Additives: Hearings on H.R. 7624 and S. 2197 Before the House Comm. on Interstate and Foreign Commerce,* 86th Cong., 2d Sess. 80–81 (1960) (colloquy among Secretary of Health, Education and Welfare Flemming, FDA Commissioner Larrick and Representative Springer):

MR. SPRINGER. If it is going to take you years to make these tests won't it take that long for the companies also to make the same tests?

MR. LARRICK. Yes.

SECRETARY FLEMMING. You are referring now to the food additives law. Yes.

MR. SPRINGER. With reference to this situation, if it is going to take you years to do it, it is certainly going to take many of these companies a substantial amount of time to do it.

SECRETARY FLEMMING. Mr. Congressman, there is not any doubt that we do have to allow the companies a reasonable amount of time; and, of course, that is one of the matters that this committee considered when it put in the provision for the effective dates of the law, and when it also made provision for an extension on our part. Of course, I think we should keep in mind the fact that one of the great things about the food additives law is that instead of the total responsibility rest-

ing on a single Government agency, the responsibility has been spread out to all of the companies that are involved in this operation. So, obviously, I think with the total resources of industry at the disposal of the country, they can move much faster than it would have been possible for the Food and Drug Administration to have moved if it had to continue to carry the entire load.

But I think that the Congress very wisely gave us the right to take a look at the situation and pass on the individual cases, and determine whether an extension should be granted.

*See also id.* at 485 (remarks of Committee Chairman Harris, summarizing testimony): "Some contend that it takes not only a year or 2 years or 3 years to test certain additives, but that it would take 7 years to develop the data on which to make a finding. And that seems to be the dilemma."

12. In their brief appellants speak of current evidence of the unsafety of Red Dye No. 9, one of the provisionally listed color additives. Brief for Appellants at 27. They argue that this evidence indicates the Commissioner has failed to meet his statutory obligation of safeguarding the public health and safety. This evidence, which consists of a preliminary report of the National Cancer Institute concluding that Red Dye No. 9 is a carcinogen, does not appear to have been presented to the FDA during this rulemaking proceeding. If not, this court can hardly conclude that the Commissioner has abused his discretion in failing to consider evidence not in the record. In any event, the FDA has the authority summarily to terminate the provisional listing of an additive at any time in response to a citizen petition pursuant to 21 C.F.R. § 10.30 (1982). Appellants may avail themselves of this administrative avenue of relief.

than nit-picking. This court has power to set aside the decision of the Commissioner only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Section 10(e)(2)(A) of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) (1976). Given the facts here, we have no choice but to uphold the Commissioner's decision.

As the statute requires, the Commissioner found that the postponements of the closing dates were consistent with the public health and with the completion of the scientific investigations in good faith as soon as reasonably practicable.

Appellants' main challenge is that the Commissioner thereby sanctioned delays that were "foreseeable and avoidable," and thus abused his discretion. The Commissioner cited four specific grounds for delay. 45 Fed.Reg. 75,227 (1980); 46 Fed.Reg. 18,954, 18,956 (1981). As the district court summarized the Commissioner's explanation for "the failure to have everything completed by the January 31[, 1981] closing date, the delays were the result of

(1) the newness of the tests themselves, (2) unforeseeable, unavoidable, normal human mistakes, (3) the shortage of both laboratories large enough to handle this type of testing and trained pathologists, and (4) the FDA's having been unrealistic in originally setting the January 31 closing date (i.e. the Commissioner admits that it was a date that allowed no room for error of any type).

*McIlwain v. Hayes,* at 978. There is ample record evidence to support each of the Commissioner's findings. Moreover, as the Commissioner noted, there were no rule-making comments which presented data or other evidence to controvert specifically his finding of "extraordinary circumstances." 46 Fed.Reg. at 18,956 n.1.

Appellants now make several complaints. First, they argue that the manufacturers caused significant delays as to some additives by beginning testing at dosage levels that were ultimately found to be too low by the FDA. The FDA responds that the sponsors could not have met the FDA time-table unless they began testing before dosage levels had been agreed upon, that there was a basis in the scientific literature for the dosages used, and that these were new tests for which experience provided little guidance. Second, appellants complain that when the higher dosage levels were chosen for eleven of the twenty-three additives, the industry continued testing at the lower dosages. The FDA responds that it permitted this because if toxicity were shown at lower levels, the higher dose testing would have been useless, and the agency decided not to tie up scarce laboratory resources for testing that might be pointless. Moreover, at that time the FDA was not sure that its desire for higher-dosage testing was justified. Appellants' third point is that the shortage of some color additives could have been avoided by the manufacturers who controlled the supply. The FDA replies that this problem was not foreseeable and avoidable, that the amounts of additives needed were large and depended upon the dosage levels ultimately chosen, and that mistakes of mislabeling and misdosing were made in testing laboratories. Appellants make other complaints, such as the Commissioner's failure to foresee accurately the shortages of laboratory facilities and personnel that led him in 1977 to choose an unrealistically early closing date of January 31, 1981, despite industry warnings about the problem. It is wholly unclear how the Commissioner's mistake then in not giving the industry enough time bars him now from giving the time that is needed.

There is more of the same but it suffices to say that none of appellants' allegations, measured against the Commissioner's findings and the record, comes close to establishing an abuse of discretion. The FDA and the industry have been dealing with an enormously complicated, uncertain, and evolving technology. The district court put the matter succinctly when it said, "[P]laintiffs' allegations attack the defendants because everything did not work perfectly . . ." *McIlwain v. Hayes,* at 978. Perfection is not a requirement of the statute.

Since we hold that the Commissioner has acted in compliance with the transitional provisions of the Color Additive Amendments and has not abused his discretion, we have no reason to adopt appellants' suggestion that we nonetheless impose our own timetable upon the testing and evaluating process. Appellants have not shown that the Commissioner is acting in bad faith and we are certain that the FDA knows infinitely more about the practical and scientific problems involved than does this court.

*Affirmed.*

MIKVA, Circuit Judge, dissenting:

By 1960, Congress clearly was dissatisfied with the manner in which the Food and Drug Administration (FDA) was carrying out its mandate to regulate the use of color additives in foods, drugs, and cosmetics. The assignment of the burden of proof, requiring the FDA to show that an additive was unsafe before it could be removed from the market, had caused the law to become largely a dead letter. And so, in the Color Additive Amendments of 1960 (Amendments),[1] Congress shifted the burden of testing color additives from the FDA to industry, forcing industry to prove each additive safe before the additive could be permanently listed and marketed. To manage the problem arising from those additives already on the market, Congress established a provisional listing program that was to end after the additive was proven safe or unsafe, or after a two and one-half year period, whichever came first. Only under exceptional circumstances was it anticipated that any additives already on the market would take more than two and one-half years to be proven safe or removed from the market. Indeed, the major factor that motivated Congress to enact the Amendments was the possibility that if the burden were not shifted, the FDA might take "as much as 20 years" to determine the safety of the existing additives. *See infra* text at 1050.

Some twenty-two years later, the majority is willing to let the FDA and industry go some more tortured miles to keep color additives that have not been proven safe on the market. The majority has ignored the fact that Congress has spoken on the subject and allows industry to capture in court a victory that it was denied in the legislative arena. The 1960 Color Additive Amendments have been made inoperative by judicial fiat. I dissent.

I. STATUTORY FRAMEWORK

The discussion and holding in the majority opinion reveal a determined refusal to acknowledge the major change the Amendments wrought in the regulation of color additives. Prior to 1960, every additive was allowed to enter the market unless the FDA could establish that the additive was not harmless. As a means of consumer protection, this allocation of the burden of proof proved to be inadequate. S.REP.No. 795, 86th Cong., 1st Sess. 3 (1959) (hereinafter "S.REP."); H.R.REP.No. 1761, 86th Cong., 2d Sess. 8 (1960), U.S.Code Cong. & Admin. News, p. 2887 (hereinafter "H.R.REP."). Spot testing during the late 1950's demonstrated that a number of additives on the market were not harmless and made clear the need for retesting. Limited in its resources, the FDA estimated that such a process, if it were to conduct the safety determinations itself, could take "as much as 20 years." *Color Additive Hearings on H.R. 7624 and S. 2197 Before the House Committee on Interstate and Foreign Commerce,* 86th Cong., 2d Sess. 25 (1960) (hereinafter *"Hearings"*); S.REP. at 4; H.R.REP. at 8. Fearing that additional additives would eventually be found unsafe and that the public could be exposed to these additives for an extended period of time, Secretary Flemming of the Department of Health, Education and Welfare (HEW) agreed that Congress should change the law:

---

1. Pub.L.No. 86–618, 74 Stat. 399. Title II, which deals with the transitional provisions at issue here, has not been codified. It is contained in the note following 21 U.S.C. § 376 (1976). Its principal section is section 203.

The crux of the matter with respect to the deficiency in consumer protection under the law as it now stands is simply this: While the [color additives] now permitted were originally listed on the premise that they were "harmless," our own retesting program—using newer scientific knowledge—has shown this premise to be false with respect to most of the colors retested so far. This makes it probable that the premise will also prove to be false on many of the remaining colors. Yet, under the present law, we must continue our tests and assume the burden of proving as to each listed color that it is not harmless before we can take that color off the permitted list. It would take many years for the Food and Drug Administration to complete this testing of the [color additives] now in use. This burden, it seems to us, properly belongs on those who manufacture the colors . . . .

*Hearings* at 39–40. *See also* S.REP. at 3–4.

In the face of delayed identification and removal of the harmful additives, Congress chose not to wait "as much as 20 years" for the FDA to complete its testing. As Congressman Delaney, a principal sponsor of the Amendments, explained:

It is vitally important for the protection of the consumer that the producer of a dye be required to test it for safety before permitting its introduction into our foods, drugs, or cosmetics. The Food and Drug Administration simply does not have the facilities or the staff to test all the colors proposed for use. The Agency is now engaged in retesting coaltar dyes it cleared for use many years ago, and as a result of new and more sensitive testing procedures, a number of these dyes have been found to be harmful and have been removed from the approved list. *FDA figures that it would take 20 years to complete the retesting program. During that time the public would have to run the risk of daily exposure to dyes which*

have not been clearly proven to be safe. This cannot be justified on any grounds.

106 CONG.REC. 14350 (June 25, 1960) (emphasis added).

As a consequence, Congress legislated to shift to industry the burden of proving each new additive to be safe. The question remained, however, how the additives already on the markets were to be treated. Although Congress wanted an "orderly transition" from the previous regulatory scheme to the new one, H.R.REP. at 10, the desire for orderliness hardly constituted carte blanche approval of those additives that were already being marketed.

In fact, Congress expressly rejected industry's request that existing additives be "grandfathered" into the law, *see Hearings* at 233, 546–47. Congress did so in spite of the fact that it had used such an approach in comparable licensing schemes for food additives and drugs. *See generally* 21 U.S.C. §§ 321(p)(1), (s)(4). The reason for this rejection is clear. There is a sharp distinction between food additives and drugs, which add either medicinal or nutritional value to a product, and color additives, which merely enhance the product's appearance.[2] As Congressman Delaney observed:

I can say that in the matter of color additives there is every reason why we should have a strong bill. Some food additives serve a useful purpose. They have helped develop and improve our food supply in many ways. However, color additives provide no nutrient value. They have no value at all, except socalled eye appeal. We should be particularly careful with them, therefore. They add nothing in any other way.

*Hearings* at 108.

Congress chose instead a two and one-half year transitional period—a choice that was deliberate and knowing as far as Congress was concerned. As the majority cor-

**2.** The extremely limited value of color additives has also been recognized by the Supreme Court in *Flemming v. Florida Citrus Exchange,* 358 U.S. 153, 162, 79 S.Ct. 160, 166, 3 L.Ed.2d 188 (1958), and by this court in *Certified Color Manufacturers Ass'n v. Mathews,* 543 F.2d 284, 296 (D.C.Cir.1976).

rectly points out, Congress received much testimony on the appropriate length of time for these tests. Majority at 1047–1048. What the majority ignores, however, is the statement by Secretary Flemming summarizing the position of HEW in support of the bill and time frame chosen:

> There was indication during the hearings that some believe the [Amendment] requires every additive to be tested for 7 years before a decision can be reached as to its safety. This is not correct.
>
> Safety of a food additive is ordinarily determined by feeding the chemical to test animals for 2 years. This feeding period permits observations to be made on any changes in the test animal that would indicate any type of hazard, of which cancer is but one.
>
> If the chemical passes the 2-year test, it may then be allowed in food. If it fails to pass because the 2-year test raises some question that still needs to be explored, then the decision as to whether further testing should be undertaken is an economic one to be reached by the promoter of the additive.
>
> *In the vast majority of cases the 2-year test permits a final decision on the chemical. But if it does not, public health considerations certainly would require that the chemical not be used until its safety is fully established.*

*Hearings* at 503–04 (emphasis added).

Extensions of the two and one-half year statutory time period were expected to be infrequent and difficult to come by. Secretary Flemming made clear that any extensions were to be limited in nature:

> There is no justification, from the point of view of the public interest, in driving either color manufacturers of food, drug, or cosmetic producers, dependent upon the use of color, out of business where the particular use of color involved is one which can safely be admitted under proper conditions of use (including tolerance limitations and certification requirements) established by this Department. Hence, while, as a consumer protection agency, we are concerned first and fore-

most with the protection of consumer interests, equity to the commercial interests concerned is also a factor in the submission of this proposal. *It should, however, be stressed in this connection that we could not agree to a dilution or relaxation of the limitations of the carefully designed transitional provisions of this bill with respect to color additives which have heretofore been in commercial use.*

*Hearings* at 26 (emphasis added).

Accordingly, while Congress did not explicitly limit the number of extensions the Commissioner could grant, it agreed with the Secretary's assessment and provided that an extension could be granted *only* if consistent with the public health, *only* pending completion of the necessary scientific investigations, and *only* if consistent with the good faith completion of such investigations as soon as reasonably practicable. Nowhere did Congress suggest that an extension should last for twenty years—the very time period used as the extremity requiring Congress to shift the testing burden to industry.

Although Congress did allow industry a grace period of two and one-half years, it explicitly stated that the transitional provisions were designed to provide for the use of existing additives only "on an interim basis for a reasonable period," § 203(a)(1). While the majority insists that this case can be resolved on the basis of the plain meaning of the statute, it reads this phrase out of existence. What is "reasonable" must be determined in light of the entire statutory scheme. In this case Congress made the decision that a "reasonable period" was not, in general, any longer than two and one-half years. Moreover, in enacting the Amendments, Congress explicitly rejected a retesting program that could last "as much as 20 years" because it was "[unwilling] to allow widespread use of [color additives] in the absence of scientific information on the effect of these products on the human body." *Certified Color Manufacturers Ass'n v. Mathews,* 543 F.2d 284, 287 (D.C. Cir.1976).

## II. Regulatory History

For twenty-two years, the twenty-three color additives at issue in this case have been used commercially notwithstanding the clear directive of Congress to the contrary. The majority admits this is a long time, but they hold that "[p]erfection is not a requirement of the statute." Majority at 1049. Such a perception of "perfection" suggests that the court may not think this dispute as important as appellants or the Congress seem to believe. Indeed the majority suggests that appellants' challenge is "little more than nitpicking." One may marvel at the tolerance and patience that the majority exhibit toward the administrative process, but one equally must be dismayed at the short shrift given a clear legislative mandate.

At the time the Amendments were enacted in 1960, some eighty-four additives were currently being used in foods, drugs, and cosmetics and therefore were deemed provisionally listed. The safety of these eighty-four additives was still undetermined two and one-half years later, however, and, consequently, the closing dates were extended on January 11, 1963. From this first extension until February 4, 1977, the closing dates for each of the twenty-three additives at issue in this case were extended an additional twelve to sixteen times. The justification for these extensions was that additional time was needed to complete the scientific testing necessary to determine the additives' safety. By 1977, only thirty-two additives had been removed from the provisional list—twenty having been permanently listed and the other twelve having been found unsafe.

In granting the 1977 extensions, the FDA Commissioner squarely confronted the question of whether the number of extensions to date was consistent with the congressional mandate. After conceding that "Congress probably did not anticipate in 1960 that color additives would be provisionally listed in 1976," 42 Fed.Reg. 6992, 6993 (Feb. 4, 1977), the Commissioner stated that the 1977 extension should "close the books" on the matter. *Id.* at 6992. He stressed the

fact that only in "extraordinary circumstances" would the time requirements be altered and that failure to comply with the prescribed time schedule would "result in termination of the provisional listing of the affected color additive." *Id.* at 6995–96. The Commissioner asserted that the FDA's review of the data and final determinations would be given the "highest priority" by the agency and stated that he expected industry to give the project the "same high priority." *Id.* at 6998. He added:

> [I]n the unlikely event that *unforeseen* and *unavoidable* circumstances arise to make compliance with the requirements of the final regulation virtually impossible, the Commissioner will consider requests for brief extensions of the closing dates. *The Commissioner cautions, however, that such requests will be considered only if "extraordinary circumstances" exist and maximum effort has been given to meeting the deadlines.*

*Id.* (emphasis added).

Notwithstanding those strong words uttered in 1977, the FDA has continued to kick the statutory scheme into perdition. In 1977, industry was able to push the deadline into 1981, and on March 27, 1981, in the decision under review here, the FDA Commissioner extended the extensions to 1984—an appropriate year indeed.

## Conclusion

This charade of the regulation of color additives is a pungent example of the administrative process at its worst. Twenty-two years ago, Congress passed a statute saying that industry would have the burden of proving that color additives were safe. Over this twenty-two year period, the FDA has time after time extended the deadlines for industry to make its case for existing color additives. By affirming the 1981 decision of the FDA Commissioner granting this latest extension, the majority of this court puts its imprimatur on this disgraceful track record.

It is quite likely that some of these additives cannot be shown to be safe. In fact, a preliminary study by the National Cancer

Institute concludes that Red Dye No. 9, still provisionally listed, is a carcinogen.[3] Nevertheless, the majority's decision today allows these additives to stay on the market long after Congress would have required industry to fish or cut bait. The majority tells the appellants not to seek a "perfect" result from the statute. The Court's decision may well be the pluperfect result of contempt for the legislative process—a situation in which Congress speaks but the court spikes.

See also, D.C.Cir., 655 F.2d 264; 102 S. Ct. 1749; 102 S.Ct. 2954.

**3.** More recently, an industry-sponsored study of Blue Dye No. 2 has indicated that rats fed Blue Dye No. 2 have a "significant difference in incidence of brain neoplasms." Washington Post, Sept. 24, 1982, at A16, col. 1. Although this study has not been confirmed, it demonstrates that the risks to consumers while these untested dyes remain on the market may be more than potential.