Mimi CUTLER, Stephen D. Annand
and National Council of Senior
Citizens, Appellants,

v.

Dr. Arthur Hull HAYES, Jr., et al.

No. 82–2365.

United States Court of Appeals,
District of Columbia Circuit.

Argued June 7, 1983.

Decided May 5, 1987.

William B. Schultz, with whom Katherine A. Meyer and Alan B. Morrison, Washington, D.C., were on the brief, for appellants.

Neil R. Ellis, Atty., Dept. of Justice, with whom William F. Baxter, Asst. Atty. Gen., Dept. of Justice, Robert B. Nicholson, Atty., Dept. of Justice, Washington, D.C., Thomas Scarlett, Chief Counsel, and Kenneth C. Baumgartner, Associate Chief Counsel, Food and Drug Admin., Rockville, Md., and Jeffrey N. Gibbs, Sp. Asst. U.S. Atty., Washington, D.C., were on the brief, for appellees.

Robert A. Altman, with whom J. Griffin Lesher, Bryan Jay Yolles, Daniel F. O'Keefe, Jr., and Gregory M. Fisher, Washington, D.C., were on the brief, for appellee/cross appellant The Proprietary Ass'n, Inc.

Before ROBINSON and SCALIA *, Circuit Judges, and WRIGHT, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge SPOTTSWOOD W. ROBINSON, III.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

This case presents a challenge by consumers of over-the-counter (OTC) drugs to the program undertaken by the Food and Drug Administration (FDA) comprehensively to review these drugs for their safety and effectiveness. The consumers allege (1) that the regulations implementing this program violate the Food, Drug and Cosmetic Act of 1938 (FDC Act),[1] as amended by the Drug Amendments of 1962,[2] pursuant to which they were promulgated; (2) that FDA's policy of nonenforcement of the efficacy requirement for marketing over-the-counter drugs in interstate commerce violates the agency's statutory duty; and (3) that FDA's lack of progress in completing the review program and the unlikelihood that the review will be completed in the near future infringes the provisions of the Administrative Procedure Act[3] disapproving unreasonable agency delay. The District Court granted appellees' motion for summary judgment on all counts. While we affirm the District Court's judgment on appellants' first two claims, we vacate the judgment on the charge of unreasonable delay and remand the case to the District Court for reconsideration in accordance with this opinion.

## I. THE STATUTORY SCHEME AND THE OTC DRUG REVIEW PROGRAM

The FDC Act prohibits the marketing of "new drugs" without premarketing approval by FDA of a new drug application (NDA).[4] The FDC Act as originally

* Judge (now Justice) Scalia was a member of the panel at the time this case was argued, but did not participate in this opinion.

1. Pub.L. No. 717, ch. 675, 52 Stat. 1040 (1938) (codified as amended at 21 U.S.C. §§ 301–392 (Supp. III 1985)).

2. Pub.L. No. 87–781, 76 Stat. 780 (1962).

3. 5 U.S.C. §§ 551–559, 701–706, 1305, 3344 (1982).

4. 21 U.S.C. § 355(a) (Supp. III 1985). The procedure to be followed by the FDA in reviewing NDAs is contained in id. §§ 355(b)–(d). It was supplemented by the Drug Price Competition and Patent Term Restoration Act of 1984, Pub.L. No. 98–417, 98 Stat. 1585 (codified in relevant part at 21 U.S.C. § 355 (Supp. III 1985)), which authorizes an abbreviated new-drug application procedure for generic new drugs equivalent to new approved drugs. See id. § 355(j); H.R.Rep. No. 98–857, 98th Cong., 2d Sess., reprinted in [1984] U.S.Code Cong. & Admin.News 2647.

adopted by Congress classified "new drugs" as those not generally recognized by experts as *safe* for their intended use (GRAS).[5] In 1962, Congress amended the definition of "new drugs"[6] to include all drugs "not generally recognized among experts ... as *safe* and *effective* for use [GRAS/E] under the conditions prescribed, recommended, or suggested in the labeling thereof."[7] Drugs first marketed before 1938 were exempted from both the safety and efficacy requirements of the Act provided that they were not subsequently relabeled.[8] Similarly, drugs marketed between 1938 and 1962 as GRAS, and thus without an NDA, were exempted from the newly-imposed efficacy requirement as long as the conditions for use suggested by the labeling remained unchanged.[9]

The 1962 amendments specified that after a two-year transition period,[10] all "new drugs" marketed under an approved NDA would be subject to the effectiveness requirement, and directed the FDA to withdraw approval, after due notice and an opportunity for a hearing, of all NDAs for drugs that failed to satisfy both the safety and efficacy requirements.[11] To support a finding of effectiveness, Congress required substantial evidence to demonstrate that a drug actually produces its claimed effect.[12] The efficacy requirement became operative immediately for drugs not classified as "new drugs."[13] For such drugs to be classified as GRAS/E, there must be an "expert consensus ... founded upon 'substantial evidence'" of the drug's effectiveness[14] and safety.[15]

In 1966, FDA began its effort to ensure compliance with the new requirements of the FDC Act by initiating its Drug Efficacy Study Implementation (DESI) review to determine whether all "new drugs"—those marketed pursuant to an approved NDA—satisfied the Act's efficacy requirement.[16] The vast majority of the products examined in this study were prescription drugs, sold only under the direction of a physician.[17]

In 1972, upon completion of this review,[18] FDA turned its attention to phar-

---

5. Federal Food, Drug and Cosmetic Act of 1938, § 201(p)(1), 52 Stat. 1041–1042 (1938) (emphasis added).

6. Drug Amendments of 1962, §§ 102(a)–(b), Pub.L. No. 87–781, 76 Stat. 780, 781 (1962).

7. 21 U.S.C. § 321(p)(1) (1982) (emphasis added). These experts must be "qualified by scientific training and experience to evaluate the safety and effectiveness of drugs." *Id.* To be excluded from "new drug" status, a medication must also be used to a "material extent or for a material time" for purposes other than simply evaluating safety and effectiveness. *Id.* § 321(p)(2).

8. See *id.* § 321(p)(1). These medicines are subject to the provisions of the Food and Drug Act of June 30, 1906, as amended. *Id.; see United States v. Rutherford,* 442 U.S. 544, 548 n. 3, 99 S.Ct. 2470, 2473 n. 3, 61 L.Ed.2d 68, 74 n. 3 (1979).

9. Pub.L. No. 87–781, § 107(c)(4), 76 Stat. 780, 789 (1962).

10. *Id.* § 107(c)(3)(B), 76 Stat. 780, 788–789 (1962). During this period, the efficacy requirement was not enforceable. *Id.*

11. 21 U.S.C. § 355(e) (Supp. III 1985).

12. *Id.* "Substantial evidence" is defined as "evidence consisting of adequate and well-controlled investigations, including clinical investi-gations, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved, on the basis of which it could fairly and responsibly be concluded by such experts that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the labeling or proposed labeling thereof." *Id.* § 355(d).

13. Pub.L. No. 87–781, § 107(a), 76 Stat. 780, 788 (1962).

14. *Weinberger v. Hynson, Westcott & Dunning, Inc.,* 412 U.S. 609, 632, 93 S.Ct. 2469, 2484, 37 L.Ed.2d 207, 224–225 (1973). The FDC Act did not define the degree of proof necessary to qualify for the GRAS/E exemption.

15. *United States v. Rutherford, supra* note 6, 442 U.S. at 549–550 n. 7, 99 S.Ct. at 2474 n. 7, 61 L.Ed.2d at 75 n. 7.

16. *American Pub. Health Ass'n v. Veneman,* 349 F.Supp. 1311, 1313–1314 (D.D.C.1972).

17. See *Cutler v. Kennedy,* 475 F.Supp. 838, 844 (D.D.C.1979).

18. In *American Pub. Health Ass'n v. Veneman, supra* note 16, the District Court for the District of Columbia held that FDA regulations which permitted the continued marketing of drugs

maceuticals marketed under the Act's GRAS/E exemption, which include primarily over-the-counter drugs,[19] readily accessible to all consumers for use without medical supervision. A drug efficacy study undertaken by the National Academy of Science-National Research Council (NAS-NRC) had concluded, after reviewing 420 drugs broadly representative of the OTC market, that only one-fourth of the drugs reviewed were actually effective.[20] In response, FDA began a comprehensive review of all OTC drugs to determine whether they were properly marketable under the GRAS/E exemption.[21] Instead of evaluating each of the hundreds of thousands of those drugs [22] individually, however, FDA classified the medications according to their comparatively few active ingredients,[23] and directed the OTC drug review to be conducted in four phases. First, advisory review panels of qualified experts are appointed to analyze existing test data and make recommendations in the form of monographs establishing the conditions under which each OTC drug could be marketed without an NDA.[24] In Phase II, FDA reviews these monographs and publishes them in the Federal Register for public comment on the safety and effectiveness of the products under examination.[25] The

third stage of the program obligates FDA to review comments, to publish a tentative final monograph, and to offer the public the opportunity to object formally, either in writing or at a hearing, to the findings made with respect to individual drugs.[26] In the fourth and final part of the OTC review, FDA promulgates a final monograph containing the agency's conclusive and legally binding determinations on the conditions under which a drug is considered GRAS/E.[27]

The regulations call upon the agency to categorize products into three groups: Category I, covering drugs recognized as safe and effective and establishing the conditions under which they may be marketed; [28] Category II, including all ingredients, labeling claims and other conditions that would result in a drug's being not generally recognized as safe and effective; [29] and Category III, including ingredients for which available data are insufficient to justify classification in either of the other groups.[30] As originally promulgated by FDA, the regulations authorized the marketing of any Category III drug after publication of the final monograph provided the manufacturer engaged in additional testing.[31] The District Court for the District of Columbia, however, struck down

conclusively found to be ineffective, while affording manufacturers an opportunity to provide additional data to FDA on the question of efficacy, violated the clear language of the FDC Act requiring removal of such drugs from the market after the grace period. 349 F.Supp. at 1315–1316, 1317. The court also directed FDA to complete its evaluation of certain over-the-counter drugs marketed under NDAs instead of postponing its consideration of these products until initiation of the over-the-counter drug review program. *Id.* at 1317. FDA had examined prescription drugs before OTC drugs because of the former's greater potential for harm to consumers. 37 Fed.Reg. 85 (1972).

**19.** See *Cutler v. Kennedy, supra* note 17, 475 F.Supp. at 844.

**20.** 37 Fed.Reg. 85 (1972).

**21.** See 37 Fed.Reg. 9464–9475 (1972) (codified at 21 C.F.R. § 130.301 (1973)).

**22.** See *Weinberger v. Bentex Pharmaceuticals, Inc.,* 412 U.S. 645, 650, 93 S.Ct. 2488, 2492, 37 L.Ed.2d 235, 240 (1973) (estimating between

100,000 and 500,000 OTC drugs); *Cutler v. Kennedy, supra* note 17, 475 F.Supp. at 844–845.

**23.** 37 Fed.Reg. 86 (1972). FDA originally estimated that all OTC drugs were comprised of approximately 200 active ingredients, used alone or in varying combinations. *Id.*

**24.** 21 C.F.R. §§ 330.10(a)(1)–(5) (1986); see *Cutler v. Hayes,* 549 F.Supp. 1341, 1345 (D.D.C. 1982).

**25.** 21 C.F.R. § 330.10(a)(6) (1986); see *Cutler v. Hayes, supra* note 24, 549 F.Supp. at 1345.

**26.** 21 C.F.R. §§ 330.10(a)(7)–(8) (1986); see *Cutler v. Hayes, supra* note 24, 549 F.Supp. at 1345.

**27.** 21 C.F.R. § 330.10(a)(9) (1986); see *Cutler v. Hayes, supra* note 24, 549 F.Supp. at 1345.

**28.** 21 C.F.R. § 330.10(a)(5)(i) (1986).

**29.** *Id.* § 330.10(a)(5)(ii).

**30.** *Id.* § 330.10(a)(5)(iii).

**31.** 21 C.F.R. § 330.10(a)(13) (1981).

this provision, holding that it directly contravened the FDC Act by sanctioning for an indefinite period the marketing of drugs that were unable to satisfy the GRAS/E requirements.[32] In response to this decision, FDA amended its regulations to their present form, eliminating the post-final monograph marketing authorization for Category III drugs,[33] but adding a twelve-month period following publication of the tentative final monograph in which the administrative record is kept open for receipt of new information regarding the safety and effectiveness of drugs tentatively placed in Category III.[34]

The OTC drug review has progressed sluggishly at best since its inception in 1972. The District Court found that FDA had completed Phase I of its OTC review.[35] Phase II was scheduled for completion by the end of 1983,[36] but because of FDA's policy requiring completion of each phase before proceeding to the next stage of review,[37] the vast majority of the tentative final monographs and final monographs to be produced are yet to be completed [38] and are not expected to be forthcoming for some time.[39]

## II. PROCEEDINGS BELOW AND ISSUES ON APPEAL

Appellants Mimi Cutler and Stephen Annand,[40] consumers of over-the-counter drugs, challenge both the legality of the regulations governing the OTC drug review and the progress of that program as implemented.[41] They argued unsuccessfully before the District Court and again argue on appeal (1) that FDA's failure to complete the OTC review more than 10 years after it was initiated, and over 20 years after the efficacy requirement was added to the FDC Act, constitutes agency action unreasonably delayed contrarily to

**32.** *Cutler v. Kennedy, supra* note 17, 475 F.Supp. at 855.

**33.** *Cutler v. Hayes, supra* note 24, 549 F.Supp. at 1345.

**34.** 21 C.F.R. § 330.10(a)(7)(iii) (1986). The legality of this new provision is challenged by appellants in this case. See notes 176–177 *infra* and accompanying text.

**35.** *Cutler v. Hayes, supra* note 24, 549 F.Supp. at 1345.

**36.** See Brief for Appellees at 8.

**37.** See *id.* at 29.

**38.** *Id.* at 26. In May of 1982, seven of a projected 77 monographs had been promulgated in final form. See Milestone Status of OTC Drug Review Documents (May, 1982), reproduced at Joint Appendix (J.App.) 354. In February of 1987, 16 of a projected 99 monographs had been promulgated in final form. See Milestone Status of OTC Drug Review Documents (February 20, 1987), Attachment B to Letter from Robert A. Nicholson, United States Department of Justice to George A. Fisher, United States Court of Appeals (Mar. 11, 1987).

**39.** Appellants presented evidence before the District Court suggesting that the OTC program will not be completed until close to year 2000. See, e.g., Affidavit of M. Joy Dowling, J.App. 470. Appellees dispute this figure as an unofficial projection and claim that the program will be completed much sooner, possibly by 1990. See,

e.g., OTC Drug Review Assessment (Dec., 1980), J.App. 485–486 (projecting last final monograph to be completed in 1990). The District Court made no finding of fact on this question. Current progress on OTC review suggests, however, that completion of all final monographs by the agency's targeted date of 1990 is very doubtful. See *supra* note 38.

**40.** The National Council of Senior Citizens (NCSC) was also a plaintiff before the District Court, which concluded that because both Cutler and Annand had standing to sue, it was "unnecessary to determine whether the NCSC also has standing to maintain the lawsuit." *Cutler v. Hayes, supra* note 24, 549 F.Supp. at 1343 n. 2. See note 63 *infra.*

**41.** This is actually the second time these litigants have challenged the OTC drug review program. Their first effort culminated in a favorable disposition of their claim that the regulations contravened the FDC Act. See text *supra* at notes 31–32 and *infra* at notes 174–175. The complaint in this case, as originally drafted, alleged that FDA had failed to amend its regulations and thus had not conformed to the District Court's decision in *Cutler v. Kennedy, supra* note 16. Complaint ¶ 22, *Cutler v. Hayes,* No. 81–2092 (D.D.C.) (filed Sept. 3, 1981), J.App. 14. When FDA finally promulgated its revised regulations on September 29, 1981, see 46 Fed.Reg. 47730 (1981), appellants amended their complaint to allege that the new provisions continued to violate the FDC Act. Amended Complaint ¶ 22, *Cutler v. Hayes,* No. 81–2092 (D.D.C.) (filed Jan. 20, 1982), J.App. 21–22.

Sections 6 [42] and 10(c) [43] of the Administrative Procedure Act; [44] (2) that FDA's failure to complete the OTC review, when coupled with its unwillingness to bring enforcement actions against marketers of inefficacious drugs, violates the FDC Act, [45] which imposes upon FDA a duty judicially enforceable; [46] and (3) that the regulations implementing the OTC review program are inconsistent with the Act because they create an interim testing period after publication of the tentative final monograph, which, by postponing promulgation of the final monograph, protects drugs not generally recognized as safe and effective. [47]

The District Court denied the motion of intervenor-defendant The Proprietary Association, Inc. (PA) to dismiss for lack of standing to sue [48] and for failure to exhaust administrative remedies, [49] but granted FDA's motion for summary judgment. [50] The court held that the regulations as amended did not violate the FDC Act as interpreted in *Cutler v. Kennedy*, [51] and that FDA had acted neither arbitrarily nor capriciously in adding the 12–month period for submission of additional information after publication of the tentative final monograph. [52] The court rejected appellant's

claim that "FDA had adopted (and made known to the industry) a policy of non-enforcement against OTC drugs pending completion of the review which ... amounts to an implied promise of immunity for an indefinite and protracted future," [53] concluding that such a policy did not exist. [54] The District Court further found that the 17 enforcement proceedings identified by FDA [55] were "a reasonable exercise of the prosecutorial discretion the FDA ... possess[es]." [56]

Finally, in rejecting appellants' claim that failure to complete the OTC drug review program in a timely fashion constitutes unreasonable delay by FDA, the District Court relied on *McIllwain v. Hayes*, [57] in which this court held that the " '... enormously complicated, uncertain and evolving technology ...' of *mandatory* scientific testing of 23 food color additives for safety alone (being conducted by the industry itself in deference to the FDA's own finite resources) could lawfully be protracted for 24 years." [58] The District Court stressed the supposed voluntariness of the OTC drug review program, which was undertaken by FDA as one of several ap-

---

42. 5 U.S.C. § 555(b) (1982) ("[w]ithin a reasonable time, each agency shall proceed to conclude a matter presented to it").

43. *Id.* § 706(1) ("[t]he reviewing court shall ... compel agency action unlawfully withheld or unreasonably delayed").

44. Amended Complaint ¶ 21, *supra* note 42, J.App. 21. Appellants request this court to instruct the District Court, in consultation with the parties, to establish a schedule for completing the OTC drug review program within a reasonable period of time. Brief for Appellants at 47–48.

45. Amended Complaint ¶ 20, *supra* note 42, J.App. 21.

46. See *Adams v. Richardson,* 156 U.S.App.D.C. 267, 480 F.2d 1159 (*en banc* 1973).

47. Amended Complaint ¶ 22, *supra* note 42, J.App. 21–22; Brief for Appellants at 55. See text *supra* at note 34.

48. The District Court held that the PA was collaterally estopped from challenging plaintiffs' standing. *Cutler v. Hayes, supra* note 24, 549 F.Supp. at 1343.

49. *Id.* at 1343–1344, 1348.

50. *Id.* at 1348. The court also granted the intervenor's motion for judgment on the pleadings, treating it as a summary-judgment motion. See Fed.R.Civ.P. 12(c). 549 F.Supp. at 1348.

51. *Supra* note 17.

52. *Cutler v. Hayes, supra* note 24, 549 F.Supp. at 1345–1346.

53. *Id.* at 1347.

54. *Id.*

55. The parties had disagreed over whether the 17 enforcement actions identified by FDA in the course of discovery were "illustrative" or "comprehensive." *Id.* at 1347 n. 9. The District Court labeled this dispute "immaterial." *Id.*

56. *Id.* at 1347.

57. 223 U.S.App.D.C. 304, 690 F.2d 1041 (1982).

58. *Cutler v. Hayes, supra* note 24, 549 F.Supp. at 1347–1348 (quoting *McIlwain v. Hayes, supra* note 57, 223 U.S.App.D.C. at 312, 690 F.2d at 1049 (emphasis in original)).

proaches it might have utilized,[59] and the complexity of the review.[60]

We hold that the District Court erred in concluding that *McIlwain v. Hayes* controls disposition of appellants' unreasonable-delay claim and vacate the portion of its judgment relating to that issue. On all other grounds, we affirm the judgment of the District Court.

### III. STANDING

■ We first address intervenor's two threshold challenges.[61] The PA alleges that appellants Mimi Cutler and Stephen D. Annand lack standing to bring this case, and are merely "sham plaintiffs." [62] The District Court held that the doctrine of collateral estoppel precluded PA from raising the standing issue [63] since this question was conclusively resolved in *Cutler v. Kennedy*.[64] In that case, in which all parties to the present action participated, the plaintiffs were held to have standing to challenge the legality of a precursor to the present set of OTC regulations, which au-

---

**59.** *Cutler v. Hayes, supra* note 24, 549 F.Supp. at 1347.

**60.** The court noted that the program involved "over 700 active ingredients contained in various combinations in more than 300,000 OTC drug products" which had to be tested for "effectiveness as well as safety." *Id.* at 1348.

**61.** Appellees asserted initially that the District Court lacked subject-matter jurisdiction over this case, see Answer to Amended Complaint ¶¶ 2, 26, *Cutler v. Hayes*, No. 81–2092 (D.D.C.) (filed Feb. 9, 1982), J.App. 50, 54, but have not pressed the argument. The District Court apparently acted on the assumption that it had general federal-question jurisdiction, see 28 U.S.C. § 1331 (1982), as appellants had alleged. See Amended Complaint ¶ 2, *supra* note 42, J.App. 17. Because our subsequent decision in *Telecommunications Research & Action Center v. FCC (TRAC)*, 242 U.S.App.D.C. 222, 750 F.2d 70 (1984), clarified the standard for determining jurisdiction to examine the pace of agency action, we *sua sponte* consider appellees' contention anew.

*TRAC* held that "where a statute commits final agency action to review by the Court of Appeals, the appellate court has exclusive jurisdiction to hear suits seeking relief that might affect its future statutory power of review." *Id.* at 224, 750 F.2d at 72. Like the instant case, *TRAC* involved a claim of unreasonable agency delay, and we ruled that the District Court was without jurisdiction to entertain it. See *id.* at 249–251, 750 F.2d at 77–79. Essential to our holding, however, were statutory provisions enabling us to review any final FCC order. See *id.* at 249, 750 F.2d at 77. We now must ascertain whether any of appellants' claims trigger similar statutory grants of jurisdiction to review final FDA actions.

The FDC Act contains no single, overarching provision governing judicial review. Instead, discrete agency actions are subject to specialized review provisions. See, e.g., 21 U.S.C. § 355(h) (1982) (review by court of appeals of agency's disapproval of new-drug application); *id.* § 360g (review by court of appeals of regula-

tions classifying devices); *id.* § 371(f) (review by court of appeals of orders issued pursuant to provisions enumerated in § 371(e) ). Agency action taken under sections silent in this respect are directly reviewable in a district court under some appropriate head of its jurisdiction, for courts of appeals have only such jurisdiction as Congress has chosen to confer upon them. *Shaw v. United States*, 93 U.S.App.D.C. 300, 302, 209 F.2d 811, 813 (1954); *Diamond Shamrock Oil & Gas Corp. v. Commissioner*, 422 F.2d 532, 534 (8th Cir.1970).

Appellants' claims in the instant case involve FDA regulations implementing § 355 and the related agency inaction in enforcing them. Section 355(h), however, authorizes review by a court of appeals only in cases challenging disapprovals of new-drug applications, and is therefore inapplicable here. Cf. *Weinberger v. Bentex Pharmaceuticals, Inc., supra* note 22, 412 U.S. at 651, 93 S.Ct. at 2493, 37 L.Ed.2d at 240–241 (interpreting § 355(h) narrowly and endorsing district-court jurisdiction to hear appeals from orders affecting new-drug status). Similarly, § 371(f) is inapposite because § 355 is not among the provisions listed in § 371(e). We note, too, that the Supreme Court has implicitly approved the exercise of district-court jurisdiction over similar claims pertaining to FDA's enforcement duties under § 355. See *Heckler v. Chaney*, 470 U.S. 821, 824–825, 105 S.Ct. 1649, 1652, 84 L.Ed.2d 714, 719–720 (1985). We thus conclude that because in this case no statute commits direct review of FDA new drug regulations to this court, TRAC does not apply, and the District Court properly exercised jurisdiction.

**62.** Brief for Intervenor at 15–18 & n. 15.

**63.** *Cutler v. Hayes, supra* note 24, 549 F.Supp. at 1343. We agree with the District Court's conclusion, see *id.* at 1343 n. 2, that it is not necessary to determine whether NCSC, which raises the same issues as appellants Cutler and Annand, has independent standing to maintain this suit.

**64.** *Supra* note 17.

thorized the sale of Category III drugs after the issuance of final monographs.[65]

■ We begin with the observation that "the doctrine of res judicata has application 'to questions of jurisdiction as well as to other issues' [and] it ordinarily precludes a subsequent challenge to a finding that jurisdiction does exist." [66] Standing ranks amongst those questions of jurisdiction and justiciability not involving an adjudication on the merits,[67] whose disposition will not bar relitigation of the cause of action originally asserted, but may preclude, or collaterally estop,[68] relitigation of the precise issues of jurisdiction adjudicated.[69] In *Montana v. United States*,[70] the Supreme Court set forth a concise statement of the estoppel principle and the policies it promotes:

> Under collateral estoppel, once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation.... To preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple law suits, conserves judicial resources and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions.[71]

A valid jurisdictional judgment has preclusive effect, we note, even if erroneous.[72]

**65.** See notes 31–32 *supra* and accompanying text.

**66.** *Dozier v. Ford Motor Co.*, 227 U.S.App.D.C. 1, 17, 702 F.2d 1189, 1195 (1983) (emphasis omitted) (quoting *American Sur. Co. v. Baldwin*, 287 U.S. 156, 166, 53 S.Ct. 98, 101, 77 L.Ed. 231, 238 (1932) (concurring opinion) and citing *Durfee v. Duke*, 375 U.S. 106, 116, 84 S.Ct. 242, 247, 11 L.Ed.2d 186, 194 (1963) ); see also *id.* (where "jurisdictional issues ha[ve] been fully and fairly litigated by the parties and finally determined ..., the [second] court ... was correct in ruling that further inquiry was precluded").

**67.** See *Warth v. Seldin*, 422 U.S. 490, 500, 95 S.Ct. 2197, 2206, 45 L.E.2d 343, 355 (1975) ("standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal"); *Continental Cas. Co. v. Canadian Universal Ins.*, 605 F.2d 1340, 1342–1343 (5th Cir.1979), *cert. denied*, 445 U.S. 929, 100 S.Ct. 1317, 63 L.Ed.2d 762 (1980) (dismissal "for want of a judicial controversy between live litigants" is not a judgment on the merits, but on jurisdiction); *McCarney v. Ford Motor Co.*, 657 F.2d 230, 232–234 (8th Cir.1981) (standing determination does not reach merits but involves questions of justiciability and is quasi-jurisdictional in nature); *Sherman v. British Leyland Motors, Ltd.*, 601 F.2d 429, 439–440 (9th Cir.1979) (standing question is "akin to that of jurisdiction").

**68.** The res judicata effects of jurisdictional judgments have variously been discussed in terms of issue preclusion and estoppel. See Restatement (Second) of Judgments § 20 Reporter's Note to Comment b (1982).

**69.** See *Dozier v. Ford Motor Co., supra* note 66, 227 U.S. App.D.C. at 14–15, 702 F.2d at 1192–1193 (amount in controversy for diversity jurisdiction); *Carr v. District of Columbia*, 207 U.S.

App.D.C. 264, 272–273, 646 F.2d 599, 607–608 (1980) (subject-matter jurisdiction); *Estevez v. Nabers*, 219 F.2d 321 (5th Cir.1955) (lack of justiciable controversy); *Oglala Sioux Tribe v. Homestake Mining Co.*, 722 F.2d 1407, 1411–1413 (8th Cir.1983) (subject-matter jurisdiction); see also *Segal v. American Tel. & Tel. Co.*, 606 F.2d 842, 844–845 (9th Cir.1979) (dismissal for lack of jurisdiction results in issue preclusion, which unlike bar, forecloses litigation only of those issues of fact or law that were actually litigated and necessarily decided by a valid and final judgment between the parties); see generally 1B J. Moore, J. Lucas & T. Currier, Moore's Federal Practice ¶ 0.405[5] (2d ed. 1984) (discussing preclusive effect of jurisdictional judgments). For cases applying collateral estoppel principles to standing questions, see note 73 *infra*.

**70.** 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979).

**71.** *Id.* at 153–154, 99 S.Ct. at 973–974, 59 L.Ed.2d at 217.

**72.** See *Underwriters Nat'l Assurance Co. v. North Carolina Life & Accident & Health Ins. Guar. Ass'n*, 455 U.S. 691, 706–707, 709 n. 16, 102 S.Ct. 1357, 1366–1367, 1368 n. 16, 71 L.Ed.2d 558, 571–572, 573 n. 16 (1982) (principles of res judicata apply to jurisdictional judgments where "the second court's inquiry discloses that those questions have been fully and fairly litigated and finally decided in the court which renders the original judgment"); *Stoll v. Gottlieb*, 305 U.S. 165, 172, 59 S.Ct. 134, 138, 83 L.Ed. 104, 109 (1938) ("[a]fter a party has his day in court, with opportunity to present his evidence and his view of the law, a collateral attack upon the decision as to jurisdiction there rendered merely retries the issue previously determined. There is no reason to expect that the second

█ Principles of collateral estoppel clearly apply to standing determinations.[73] As the District Court correctly determined, Cutler, Annand and PA were all parties to the proceeding in *Cutler v. Kennedy;*[74] thus the sole "remaining inquiry is whether the issue presented in the two proceedings is substantially the same."[75] In the *Kennedy* case, the plaintiffs claimed that FDA's Category III regulations[76] were unlawful to the extent that they authorized marketing of OTC drugs without a prior determination of safety and effectiveness.[77] The *Kennedy* court examined the question whether the plaintiffs had standing to challenge FDA's Category III regulations, and determined that they did.[78] It found that the plaintiffs incurred an increased risk of consuming unsafe or ineffective drugs constituting a cognizable injury for standing purposes,[79] one traceable to the FDA Category III regulations they challenged[80] and redressable by the relief sought.[81] PA never appealed this judgment but, in effect,

attempts to attack it in the present action. The District Court held that principles of estoppel barred this renewed challenge to plaintiffs' standing,[82] and its judgment seems to us unquestionably correct.

FDA has eliminated post-final monograph marketing authorization for Category III drugs in accordance with the judgment in *Kennedy*, but has added a 12–month period following publication of the tentative final monograph in which the administrative record is to remain open for new information on safety and effectiveness before issuance of the final monograph.[83] It is this regulation that appellants in the present action challenge as sanctioning, in new regulatory guise, the marketing of drugs not determined to be safe and effective; they claim further that the agency's alleged policy of nonenforcement against OTC drugs disregards the agency's statutory mandate and that its delay in completing OTC review ignores the APA.[84] As the District Court found,

---

decision will be more satisfactory than the first"); 1B J. Moore, J. Lucas & T. Currier, *supra* note 69, ¶ 0.405[5], at 227, 229–230 ("[w]here the issue of jurisdiction is raised and is determined in favor of jurisdiction and the case then proceeds to a judgment on the merits, on wellsettled principles the judgment is not later open to collateral attack on the jurisdictional issue, whether or not the determination thereon was erroneous") (footnote omitted); see also 13A C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure: Jurisdiction § 3531.15, at 106 (2d ed. 1984) ("[o]rdinarily [collateral] attacks [for want of standing] should be rejected, even if the Article III requirements of standing were not met") (footnote omitted).

73. *Cutler v. Hayes, supra* note 24, 549 F.Supp. at 1343 (applying doctrine to standing) (policies furthered by collateral estoppel doctrine "are equally served when the doctrine is applied to jurisdictional questions as to the merits"). For authorities applying principles of collateral estoppel to questions of standing, see, e.g., *Safir v. Dole,* 231 U.S.App.D.C. 63, 69 n. 4, 718 F.2d 475, 481 n. 4 (1983), *cert. denied,* 467 U.S. 1206, 104 S.Ct. 2389, 81 L.Ed.2d 347 (1984); *Mrazek v. Suffolk County Bd. of Educ.,* 630 F.2d 890, 896 n. 10 (2d Cir.1980); *Planned Parenthood Ass'n v. Kempiners,* 700 F.2d 1115, 1138 (7th Cir.1983) (concurring opinion); *McCarney v. Ford Motor Co., supra* note 67; *California Chamber of Commerce v. Simpson,* 601 F.Supp. 104, 106–107 (C.D.Cal.1985); *City Communications, Inc. v.*

*City of Detroit,* 650 F.Supp. 1570, 1580 (E.D. Mich.1987).

74. *Supra* note 17.

75. 549 F.Supp. at 1343. See *infra* note 85.

76. See text *supra* at notes 28–30.

77. 475 F.Supp. at 847.

78. *Id.* at 847–850.

79. *Id.*

80. *Id.* at 850.

81. *Id.* at 850 & nn. 31–32. The court further found that to the extent that extraconstitutional requirements for standing were imposed by § 10 of the APA, 5 U.S.C. § 702 (1982), "plaintiffs' interests as drug consumers plainly satisfy [them]," falling "within the 'zone of interests to be protected or regulated by the statutory framework within which [their] claim arises'...." *Id.* at 847 n. 22 (quoting *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 39 n. 19, 96 S.Ct. 1917, 1929 n. 19, 48 L.Ed.2d 450, 461 n. 19 (1976) ).

82. *Cutler v. Hayes, supra* note 24, 549 F.Supp. at 1343.

83. See text *supra* at notes 32–34.

84. See text *supra* at notes 42–47.

the gravamen of appellants' complaint is in substance the same:[85] FDA regulatory and enforcement policy sanctions the continued marketing of Category III OTC drugs not affirmatively shown to have met FDC Act standards, in violation of the agency's statutory responsibilities.[86] No change in "controlling facts or legal principles"[87] is apparent that would qualify this determination.[88]

## IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES

■ PA next argues that appellants' failure to exhaust administrative remedies is ground for dismissal.[89] The exhaustion requirement is not jurisdictional,[90] however, but rather should be applied "flexibly, with an eye toward its underlying purposes."[91] These purposes include (1) discouraging the "'frequent and deliberate flouting of administrative processes;'"[92]

**85.** See *Cutler v. Hayes, supra* note 24, 549 F.Supp. at 1343 (inquiring "whether the issue presented in the two proceedings is substantially the same"). Cf. *Montana v. United States, supra* note 70, 440 U.S. at 155, 99 S.Ct. at 974, 59 L.Ed.2d at 218 ("whether the issues presented by this litigation are in substance the same ..."); *Schneider v. Lockheed Aircraft*, 212 U.S.App.D.C. 87, 104, 658 F.2d 835, 852 (1981) ("[t]he very heart of the collateral estoppel doctrine is the requirement that the issue to be precluded must be substantially the same as the issue previously litigated"); Restatement (Second) of Judgments § 27 Comment c (1982) (discussing factors pertinent to determining similarity of issues for preclusion purposes).

**86.** The District Court reasoned that as "[t]he parties and the threatened injury [were] the same in both cases, the standing issue is identical and was conclusively determined in the prior proceeding." *Cutler v. Hayes, supra* note 24, 549 F.Supp. at 1343. We affirm on slightly broader grounds, namely, that the *Kennedy* court's three-part finding of Article III standing (embracing injury in fact, traceability, and redressability, see text *supra* at notes 78–81) easily accommodates whatever minor variances in claims the instant action presents.

**87.** *Montana v. United States, supra* note 70, 440 U.S. at 155, 99 S.Ct. at 974, 59 L.Ed.2d at 218.

**88.** The District Court found that PA had "not introduced any evidence to refute the essential factual predicate underlying the standing decision in *Cutler v. Kennedy*, viz., that the individual plaintiffs consume OTC drugs and would be exposed to an increased health risk by the marketing of products which may not be safe or effective...." *Cutler v. Hayes, supra* note 24, 549 F.Supp. at 1343–1344 n. 3. In so ruling, the District Court correctly determined that any new evidence PA might have produced in support of its contention that the individual appellants are merely "sham plaintiffs," see Brief for Intervenor-Appellee at 14–15, was immaterial to the legal basis on which the *Kennedy* court's ultimate findings on standing rested, see *Cutler v. Kennedy, supra* note 17, 475 F.Supp. at 850 n. 34 (holding PA's "sham-plaintiff" contention "without legal merit"), and so could not demonstrate a change in controlling facts sufficient to

justify an exception to collateral estoppel principles. See *Cutler v. Hayes, supra* note 24, 549 F.Supp. at 1343 n. 3 (citing *Montana v. United States, supra* note 70, 440 U.S. at 155, 99 S.Ct. at 974, 59 L.Ed.2d at 218). Neither has there been any change in the legal principles governing the constitutional standing inquiry that would warrant excepting the *Kennedy* court's determination of standing from the normal estoppel rule. Compare *Cutler v. Kennedy, supra* note 17, 475 F.Supp. at 847–850 (three-part inquiry into constitutional elements of standing) with *American Legal Found. v. FCC*, 257 U.S.App.D.C. 189, 193, 808 F.2d 84, 88 (1987) ("[t]he Supreme Court has in recent years distilled the constitutional requirement of standing into a three-part inquiry: 'A plaintiff must allege [1] personal injury [2] fairly traceable to the defendant's allegedly unlawful conduct and [3] likely to be redressed by the requested relief'") (quoting *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556, 569 (1984) and citing *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700, 709 (1982) ).

**89.** Brief of Intervenor-Appellee at 18–19.

**90.** *Andrade v. Lauer*, 234 U.S.App.D.C. 384, 393, 729 F.2d 1475, 1484 (1984); *Beins v. United States*, 224 U.S.App.D.C. 397, 405, 695 F.2d 591, 599 (1982); *Hayes v. Secretary of Defense*, 169 U.S.App.D.C. 209, 214, 515 F.2d 668, 673 (1975).

**91.** *Etelson v. Office of Personnel Management*, 221 U.S.App.D.C. 396, 401, 684 F.2d 918, 923 (1982); accord, *McKart v. United States*, 395 U.S. 185, 193, 89 S.Ct. 1657, 1662, 23 L.Ed.2d 194, 203 (1969); *Andrade v. Lauer, supra* note 90, 234 U.S.App.D.C. at 393, 729 F.2d at 1484; *National Treasury Employees Union v. Kurtz*, 204 U.S.App.D.C. 139, 141–142, 636 F.2d 411, 413–414 (1980) (dissenting opinion).

**92.** *Andrade v. Lauer, supra* note 90, 234 U.S.App.D.C. at 393, 729 F.2d at 1484 (quoting *McKart v. United States, supra* note 91, 395 U.S. at 195, 89 S.Ct. at 1663, 23 L.Ed.2d at 204); accord, *Public Citizen Health Research Group v. Commissioner*, 238 U.S.App.D.C. 271, 279, 740 F.2d 21, 29 (1984).

(2) protecting agency autonomy by allowing an agency the first opportunity to apply its expertise, exercise its discretion, and correct its errors; (3) aiding judicial review by promoting the development of facts during the administrative proceeding; and (4) promoting judicial economy by reducing duplication, and perhaps even obviating judicial involvement.[93] Since the doctrine is not linked to the power of the court to entertain actions, but instead implicates prudential considerations, the exhaustion requirement may be waived by the agency, or disregarded by the court when application of the doctrine would be futile.[94]

■ The District Court based its rejection of the PA's argument primarily on two grounds: that FDA had failed to raise the exhaustion issue and thus had waived it,[95] and that resort to agency process in this

case would have been futile.[96] These two factors, when considered in tandem, clearly suggest that the purposes of the exhaustion doctrine would not be served by withholding our consideration of appellants' charge of unreasonable delay until FDA had a prior opportunity to reject it. As we stated in *Etelson v. Office of Personnel Management*,[97]

> [w]hen an agency has committed itself not to change its rule unless judicially compelled to do so, has made known that its general views are contrary to those of the complainant, and has never given an inkling that it would consider a matter afresh, and when the regulations in question have received careful attention within and outside the agency, a complainant need not make a *pro forma* request that the agency redo its system.[98]

**93.** *Randolph-Sheppard Vendors of America v. Weinberger*, 254 U.S.App.D.C. 45, 60, 795 F.2d 90, 105 (1986); *Public Citizen Health Research Group v. Commissioner, supra* note 92, 238 U.S.App.D.C. at 279, 740 F.2d at 29; *Andrade v. Lauer, supra* note 90, 234 U.S.App.D.C. at 393, 729 F.2d at 1484; see also *Wallace v. Lynn*, 165 U.S.App.D.C. 363, 367, 507 F.2d 1186, 1190 (1974).

**94.** See, e.g., *Mathews v. Diaz*, 426 U.S. 67, 75–77, 96 S.Ct. 1883, 1889–1890, 48 L.Ed.2d 478, 487–488 (1976); *Weinberger v. Salfi*, 422 U.S. 749, 766–767, 95 S.Ct. 2457, 2467–2468, 45 L.Ed.2d 522, 539–540 (1975); *Baxter v. Claytor*, 209 U.S.App.D.C. 188, 192, 652 F.2d 181, 185 (1981); see also *Ticor Title Ins. Co. v. FTC*, 814 F.2d 731, 751 (D.C.Cir.1987) at 2 (concurring opinion).

**95.** *Cutler v. Hayes, supra* note 24, 549 F.Supp. at 1344. PA alleges that this conclusion is erroneous since FDA's Memorandum of Points and Authorities in Support of Federal Defendants' Motion to Dismiss or in the Alternative for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment, at 20–21, Record (R.) 52, included the claim that administrative remedies had not been exhausted. Brief for Intervenor at 18. FDA has not appealed from the District Court's ruling, however, and does not argue before this court that appellants did not exhaust their administrative remedies. If an agency makes only a token effort to sustain a claim alleging failure to exhaust, a court may well conclude that the claim has been waived, particularly when futility is an issue. See, e.g., *Mathews v. Diaz, supra* note 94, 426 U.S. at 76–77, 96 S.Ct. at 1889–1890, 48 L.Ed.2d at 487–488; *Etelson v. Office of Personnel Management, supra* note 91, 221 U.S.App.D.C. at 401, 684 F.2d at 923 (claim of failure to exhaust administrative remedies made by OPM in "per-

functory and oblique manner"). Because this question involves an element of judgment by the District Court, and especially because the agency itself does not press the exhaustion issue before us, we will not overturn the District Court's determination that this claim has been waived.

**96.** *Cutler v. Hayes, supra* note 24, 549 F.Supp. at 1344.

**97.** *Supra* note 91.

**98.** *Etelson v. Office of Personnel Management, supra* note 91, 221 U.S.App.D.C. at 403, 684 F.2d at 925 (footnotes omitted). Although we were wary of possible misuse of the futility exception in *Etelson,* and thus based our holding in that case on *several* factors rather than on apparent futility alone, we recognized that the potential for abuse stems primarily from efforts to " 'deliberate[ly] flout ... administrative processes.' " *Id.* at 403–404, 684 F.2d at 925–926 (quoting *McKart v. United States, supra* note 91, 395 U.S. at 195, 89 S.Ct. at 1663, 23 L.Ed.2d at 204). In the case at bar, the fact that FDA does not press the argument that appellants have failed to exhaust administrative remedies supports the premise that an appeal to FDA would have been futile. See *Etelson v. Office of Personnel Management, supra* note 91, 221 U.S.App.D.C. at 401, 684 F.2d at 923 (OPM's failure to assert that plaintiff did not exhaust administrative remedies "strongly suggests that OPM considered itself to have rejected finally all of [plaintiff's] contentions, and it counsels us against a contrary determination"). It also seems clear that appellants have made no effort deliberately to bypass a firmly established agency procedure for resolving this controversy.

We therefore affirm the District Court's denial of intervenor's motion to dismiss for failure to exhaust administrative remedies.[99]

## V. NONENFORCEMENT OF STATUTORY MANDATE

As we understand their argument, appellants assert that FDA has abdicated its statutory duty by (1) postponing enforcement of the Act's efficacy requirement and substantially limiting enforcement of the safety mandate until the completion of the OTC drug review program, and (2) then delaying completion of the program unreasonably. They urge, citing as authority our *en banc* decision in *Adams v. Richardson*,[100] that we direct the agency to enforce both the safety and efficacy requirements of the statute.[101]

The District Court rejected appellants' argument, concluding that "FDA has not adopted a policy of total nonenforcement," and that "such enforcement as has been undertaken indicates a reasonable exercise of the prosecutorial discretion FDA was acknowledged to possess in *Cutler v. Kennedy.*"[102] The District Court found decisive the evidence submitted by FDA demonstrating that it had taken enforcement action on at least 17 occasions.[103]

We believe the court's affirmative finding in this regard is to be qualified by its failure adequately to distinguish between enforcement actions aimed at drugs that are simply ineffective and those directed at the marketing of drugs that are both ineffective and unsafe. FDA's compliance policy guidelines specify that "[p]rior to the final publication of a proposed monograph, it would not be in the agency's interest to pursue regulatory action unless failure to do so posed a potential health hazard to the consumer."[104] FDA has thus made clear that it will *not* presently take action against an OTC drug that is safe but demonstrably ineffective for its intended use.[105] The District Court erred in construing FDA's policy otherwise.

Nevertheless, *Adams v. Richardson* does not call for judicial intervention in the case at bar. In *Heckler v. Chaney*,[106] a case involving FDA, the Supreme Court held that an agency's refusal to take enforcement action is presumptively unreviewable.[107] The Court did note that an extreme case, amounting to abdication of the agency's statutory responsibilities, might warrant judicial examination,[108] citing *Adams v. Richardson* in illustration of actionable nonfeasance.[109] We find *Adams*, however, easily distinguishable from the case before us.

In *Adams*, we directed the Secretary of Health, Education, and Welfare and the Director of the Office of Civil Rights to commence enforcement proceedings against primary and secondary school districts operating racially segregated schools

---

99. We agree with the District Court, see *Cutler v. Hayes, supra* note 24, 549 F.Supp. at 1344, that it is unnecessary here to decide whether a nongovernmental party is entitled to raise the question of exhaustion of administrative remedies.

100. *Supra* note 46.

101. Brief for Appellants at 23–31.

102. *Cutler v. Hayes, supra* note 24, 549 F.Supp. at 1347.

103. *Id.;* see note 55 *supra*.

104. FDA Compliance Policy Guide 7132b.15, J. App. 587. Situations that might warrant enforcement prior to promulgation of a final monograph include: "1) documented consumer injuries; 2) drugs requiring the prescription legend marketed as OTC; and 3) unwarranted claims for the treatment of serious disease conditions which could preclude obtaining proper medical attention." *Id.*

105. Our review of the enforcement actions taken by FDA suggests that all proceedings were initiated by the agency either after the issuance of a final monograph or after identification of a specific risk to consumer health. See Appendix D to Declaration of Jerome A. Halperin, Illustrative OTC Regulatory Actions, J. App. 588–590.

106. *Supra* note 61.

107. 470 U.S. at 837–838, 105 S.Ct. at 1659, 84 L.Ed.2d at 727–728.

108. *Id.* at 833 n. 4, 105 S.Ct. at 1656 n. 4, 84 L.Ed.2d at 724 n. 4.

109. *Id.*

while receiving federal funding.[110] Title VI of the Civil Rights Act of 1964[111] explicitly directed all federal departments and agencies distributing federal funds to effectuate the provision of the Act prohibiting racial discrimination in programs accepting such funds.[112] We held that the consistent failure of the federal defendants to carry out this clear and direct statutory mandate was a "dereliction of duty reviewable in the courts,"[113] and ordered the defendants to institute enforcement proceedings against schools operating in violation of the Act.[114]

In the case before us, we have been unable to identify any statutory mandate comparable to the provisions of the Civil Rights Act we found dispositive in *Adams*. The FDC Act imposes no clear duty upon FDA to bring enforcement proceedings to effectuate either the safety or the efficacy requirements of the Act. Without a doubt, FDA has a responsibility under the Act to identify drugs generally recognized as safe and effective and require premarketing clearance for all others.[115] But Congress has not given FDA an inflexible mandate to bring enforcement actions[116] against all violators of the Act.[117] Hence, appellants' argument that judicial intervention under *Adams v. Richardson* is warranted to compel agency enforcement of FDC Act requirements is not persuasive.[118]

 Nor does FDA's policy of postponing enforcement of the efficacy requirement until after publication of final monographs afford a basis for intervention under *Heckler v. Chaney*.[119] Particularly as

---

110. *Adams v. Richardson, supra* note 46, 156 U.S.App.D.C. at 269, 480 F.2d at 1161.

111. 42 U.S.C. §§ 2000d–2000d–6 (1982).

112. *Id.* § 2000d–1 (1982) ("[e]ach Federal department and agency which is empowered to extend Federal financial assistance to any program or activity . . . is authorized and directed *to effectuate the provisions of section 2000d . . .* with respect to such program or activity. . . ."). The department or agency may ensure compliance either: "(1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement . . . or (2) by any other means authorized by law. . . ." *Id.*

113. *Adams v. Richardson, supra* note 46, 156 U.S.App.D.C. at 271, 480 F.2d at 1163.

114. *Id.* at 269, 480 F.2d at 1161.

115. In *Weinberger v. Hynson, Westcott & Dunning, supra* note 14, the Supreme Court described the 1962 amendments to the FDC Act as a "statutory mandate to review all marketed drugs for their therapeutic efficacy, whether or not previously approved." 412 U.S. at 614, 93 S.Ct. at 2475, 37 L.Ed.2d at 214; see also H.R. Rep. No. 2464, 87th Cong., 2d Sess. 3 (1962); 37 Fed.Reg. 9,464–9,465 (1972) ("[t]here can be no question, however, that the Food and Drug Administration is obligated to review all OTC drugs to assure that all those found in the marketplace are safe and effective and not misbranded"). In addition, it is clear that the efficacy requirement for the full range of OTC drugs took effect within two years of passage of the Drug Amendments of 1962. See text *supra* at notes 10–13. Hence, we disagree with the District Court's characterization of the OTC drug

review program as "voluntary." See *Cutler v. Hayes, supra* note 24, 549 F.Supp. at 1348.

116. Congress did include an enforceable statutory directive, similar to that guiding our decision in *Adams v. Richardson*, in 21 U.S.C. § 355(e) (Supp. III 1985), which provides that "[t]he Secretary shall . . . withdraw approval of [NDAs]" if appropriate evidence demonstrates that these drugs are not safe or effective.

117. The FDC Act's enforcement provisions remain almost identical to those first enacted in 1938. See 21 U.S.C. §§ 335–337 (1982). The Secretary of the Health and Human Services refers violations of the Act to the appropriate United States Attorney, who may launch either a criminal prosecution or a civil action in the name of the United States. *Id.* §§ 335, 337 (1982). But Congress made clear that the Secretary would have no obligation to "report for prosecution, or for the institution of libel or injunction proceedings, minor violations of this chapter whenever he believes that the public interest will be adequately served by a suitable written notice or warning." *Id.* § 336. FDA has authority to promulgate regulations for the "efficient enforcement" of the safety and efficacy requirements. *Id.* § 371(a).

118. Accord, *Cutler v. Kennedy, supra* note 17, 475 F.Supp. at 856 (rejecting argument that Congress created a mandatory, nondiscretionary and judicially enforceable duty upon FDA to initiate enforcement proceedings against violators of the FDC Act).

119. See 5 U.S.C. § 706(2)(A) (1982); see also *Heckler v. Chaney, supra* note 61, 470 U.S. at 831–832, 105 S.Ct. at 1656, 84 L.Ed.2d at 723–724 (discussing grounds for judicial recognition of agency discretion in enforcement decisions).

an agency with limited resources, FDA reasonably may assign enforcement of a statutory requirement designed to prevent unnecessary consumer expense to a lower priority than that accorded one concerned with identifying and eliminating threats to human life.[120] More importantly, until FDA issues a final monograph, the agency has yet to make a substantiated and conclusive determination that a drug is not generally recognized as effective;[121] besides, prior to promulgation of a final monograph, the agency's conclusion that an OTC drug is ineffective is subject to reconsideration based on new information[122] that may be submitted to FDA.[123] It would be a futile act, as well as one financially disastrous for manufacturers of pharmaceuticals, were the agency to require removal of a potentially ineffective drug from interstate commerce only to find, on the basis of later unfolding information, that the drug should have been classified as generally recognized as effective.[124] Given these rational justifications for postponing enforcement

of the efficacy requirement, we hold that FDA's policy on that score does not amount to an abuse of discretion.[125]

## VI. Unreasonable Delay of OTC Drug Review

Appellants next argue that the limited progress of the OTC drug review since its inception in 1972 has frustrated achievement of the safety and efficacy goals of the 1962 Amendments, and therefore constitutes unreasonable agency delay remediable under the APA.[126] The District Court rejected this claim,[127] relying on our decision in *McIlwain v. Hayes*.[128] That case involved the scheme of the FDC respecting food-coloring additives, and we approved an additional extension of time for industry submissions of proof of nontoxicity as a reasonable exercise of FDA's discretion despite the fact that the additives had been marketed provisionally for more than 20 years after enactment of the statute.[129] Deeming the OTC drug review a program

120. See 470 U.S. at 831, 105 S.Ct. at 1656, 84 L.Ed.2d at 724. Of course, the efficacy requirement serves several health-related purposes as well. For example, a consumer might forego an effective drug in the mistaken belief that an ineffective drug will provide relief. Current FDA policy, however, authorizes enforcement actions against ineffective drugs that present such a danger. See note 104 *supra*.

121. Brief for Appellees at 17–18.

122. See note 177 *infra*, discussing the type of "new information" which may be submitted.

123. See 21 C.F.R. § 330.10(a)(7)(iii) (1986) ("[w]ithin 12 months after publishing of a ... [tentative final monograph], any interested person may file with the Dockets Management Branch, Food and Drug Administration, new data and information to support a condition excluded from the monograph in the tentative order"); see also Part VII *infra* upholding regulation as a reasonable exercise of discretion).

124. For a drug to be generally recognized as effective, there must be "expert consensus ... founded upon 'substantial evidence.'" *Weinberger v. Hynson, Westcott & Dunning, supra* note 14, 412 U.S. at 632, 93 S.Ct. at 2484, 37 L.Ed.2d at 224; accord, *United States v. Rutherford, supra* note 8, 442 U.S. at 549–550 n. 7, 555, 99 S.Ct. at 2474 n. 7, 2477, 61 L.Ed.2d at 75 n. 7, 78. For the definition of substantial evidence, see *supra* note 12. "In the absence of any evi-

dence of adequate and well-controlled investigation supporting ... efficacy ..., [a drug] would be a 'new drug' subject to the provisions of the [FDC] Act." *Weinberger v. Hynson, Westcott & Dunning, supra* note 14, 412 U.S. at 629–630, 93 S.Ct. at 2483, 37 L.Ed.2d at 223. Thus, the additional information would have to be significant enough to change the view of those experts who previously rejected classification of the drug as effective.

125. FDA's practice of generally postponing publication of final monographs on OTC drugs until all temporary final monographs are completed is relevant to the question of unreasonable delay, and should be evaluated by the District Court on remand in conjunction with any fashioning of a remedy. See notes 168–170 *infra* and accompanying text.

126. See notes 42–43 *supra* and accompanying text. The unreasonableness of the delay, appellants argue, is compounded by alarming projections about the program's date of completion. See note 39 *supra* and accompanying text.

127. *Cutler v. Hayes, supra* note 24, 549 F.Supp. at 1347–1348.

128. *Supra* note 57.

129. *McIlwain v. Hayes, supra* note 57, 223 U.S. App.D.C. at 310–312, 690 F.2d at 1047–1049.

undertaken "voluntarily," [130] the District Court felt that it was comparable to the mode of regulation of food-coloring products:

> If the "... enormously complicated, uncertain, and evolving technology ..." of *mandatory* scientific testing of 23 food color additives for safety alone ... could lawfully be protracted for 24 years ..., it can hardly be said that a voluntary testing program of over 700 active ingredients contained in various combinations in more than 300,000 OTC drug products for effectiveness as well as safety might not reasonably be expected to take at least as long. [131]

We do not join in the District Court's characterization of the OTC drug review as a "voluntary" program. Consequently, we cannot agree that *McIlwain* supports the court's outcome on the delay claim. The District Court must now reconsider that claim in accordance with acceptable legal standards.

As we have already stated, the 1962 amendments to the FDC Act obligate FDA to review all nonexempt OTC drugs for their therapeutic efficacy [132] as well as their safety. Concededly, FDA has broad discretion in deciding how to achieve this objective. [133] The District Court erred, however, in equating the agency's freedom to exercise its discretion with voluntariness. [134] Although FDA's discretion extends to review of OTC drugs by ingredient rather than by product—a choice implicitly approved by the Supreme Court in *Bentex Pharmaceuticals* [135]—the agency lacks authority to simply do nothing to effectuate the purpose of the Act.

■ Once FDA elected to respond to its legislative directive by establishing the OTC drug review program, the APA imposed an obligation to proceed with reasonable dispatch. [136] We have often intervened to compel an agency unreasonably delaying to speed up its activities, [137] and our authority to do so in appropriate instances is not here in question. [138] In rejecting appellants' delay argument, however, the District Court examined none of the factors that have traditionally guided assessments on the propriety of agency delay; [139] rather, the court relied solely on a single precedent—*McIlwain v. Hayes* [140]—which involved a statutory scheme very different from the one before us today. The provisions governing marketing of food-color ad-

130. *Cutler v. Hayes, supra* note 24, 549 F.Supp. at 1347, 1348.

131. *Id.* at 1347–1348 (quoting *McIlwain v. Hayes, supra* note 57, 223 U.S.App.D.C. at 312, 690 F.2d at 1049).

132. See note 115 *supra* and accompanying text.

133. Cf. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823–824, 28 L.Ed.2d 136, 153 (1971) (court will not substitute judgment for that of administrative agency).

134. See *Cutler v. Hayes, supra* note 24, 549 F.Supp. at 1347, 1348.

135. See *Weinberger v. Bentex Pharmaceuticals, Inc., supra* note 22, 412 U.S. at 645, 93 S.Ct. at 2488, 37 L.Ed.2d at 235.

136. See 5 U.S.C. §§ 555(b), 706(1) (1982); notes 42–43 *supra*.

137. See, e.g., *Public Citizen Health Research Group v. Auchter,* 226 U.S.App.D.C. 413, 702 F.2d 1150 (1983); *Potomac Elec. Power Co. v. ICC,* 226 U.S.App.D.C. 289, 702 F.2d 1026 (1983);

*MCI Telecommunications Corp. v. FCC,* 200 U.S. App.D.C. 269, 627 F.2d 322 (1980); *Nader v. FCC,* 172 U.S.App.D.C. 1, 520 F.2d 182 (1975). Other circuits have similarly exercised their authority under the APA. See, e.g., *British Airways Bd. v. Port Auth.,* 564 F.2d 1002 (2d Cir. 1977); *Deering Milliken, Inc. v. Johnston,* 295 F.2d 856 (4th Cir.1961).

138. We note that appellants' allegation of unreasonable delay does not bring this case within the class involving "the question of agency discretion not to invoke rulemaking proceedings" reserved for decision in *Heckler v. Chaney, supra* note 61, 470 U.S. at 825 n. 2, 105 S.Ct. at 1652 n. 2, 84 L.Ed.2d at 719 n. 2, inasmuch as the agency has affirmatively committed itself to rulemaking pursuant to its OTC drug review program. Accord, *Oil, Chem. & Atomic Workers Int'l v. Zegeer,* 248 U.S.App.D.C. 47, 51, 768 F.2d 1480, 1484 (1985). The sole issue raised by appellants' delay claim concerns the pace of the rulemaking.

139. See notes 155–167 *infra* and accompanying text.

140. *Supra* note 57. See text *supra* at notes 127–131.

ditives contain a transitional mechanism allowing commercially-established additives to be marketed on an interim basis prior to a final determination on safety;[141] as this court observed, it authorized FDA to postpone the closing date for submissions " 'for such period or periods as ... necessary to carry out the purpose of this section.' " [142] Not only do the 1962 amendments of the FDC Act lack an analogous provision,[143] but the majority opinion in *McIlwain* took pains to distinguish the statutory arrangement in that case from the regime implicated here.[144] It should also be noted that in the case at bar, initial research had indicated that a vast number of drugs on the market were ineffective,[145] while none of the test data on the food additives at issue in *McIlwain* suggested that they were unsafe.[146] Given these significant distinctions, *McIlwain* clearly does not control the disposition of appellants' contention that there has been unreasonable agency delay.[147]

Since the District Court relied solely on *McIlwain* to support its awards of summary judgment, we must remand for reconsideration in accordance with correct legal standards. Resolution of a claim of unreasonable delay obviously may require a number of factual determinations, and may also entail a balancing of competing considerations. It therefore would be inappropriate for us to rule on the question without the benefit of initial consideration by the District Court.[148]

 Any discussion of the standards relevant to the issue of delay must begin with recognition that an administrative agency is entitled to considerable deference in establishing a timetable for completing its proceedings.[149] An agency has broad discretion to set its agenda and to first apply its limited resources to the regulatory tasks it deems most pressing.[150] The agency's discretion is not unbounded, however, since the consequences of dilatoriness may be great.[151] As we have had occasion to state, "[t]here must be a 'rule of reason' to govern the time limit to administrative proceedings. Quite simply, excessive delay saps the public confidence in an agency's ability to discharge its responsibilities and creates uncertainty for the parties, who must incorporate the potential effect of

141. See *McIlwain v. Hayes, supra* note 57, 223 U.S.App.D.C. at 309, 690 F.2d at 1046.

142. *Id.* (quoting 21 U.S.C. § 376 (1982) ).

143. Accord, *Cutler v. Kennedy, supra* note 17, 475 F.Supp. at 854 ("[t]here are ... no interim provisions under which safe, but only potentially effective drugs can be marketed pending testing").

144. *McIlwain v. Hayes, supra* note 57, 223 U.S. App.D.C. at 309–310 n. 7, 690 F.2d at 1046–1047 n. 7.

145. See text *supra* at note 20.

146. *McIlwain v. Hayes, supra* note 57, 223 U.S. App.D.C. at 306, 690 F.2d at 1043. "[I]t [was] only the fact that new, more rigorous tests have since become available that makes it possible to say that these [food additives] have not yet been conclusively demonstrated to be safe." *Id.*

147. Indeed, *McIlwain* itself seems to fully validate this conclusion. See *id.* at 309–310 n. 7, 690 F.2d at 1046–1047 n. 7.

148. Accord, *Public Citizen Health Research Group v. Commissioner, supra* note 92, 238 U.S.

App.D.C. at 284, 740 F.2d at 34. Of course, remand is proper only when the district court can exercise jurisdiction over the claim. See note 61 *supra*. A court of appeals with exclusive jurisdiction would have to employ some alternative factfinding method. See *TRAC, supra* note 61, 242 U.S.App.D.C. at 230, 750 F.2d at 78.

149. *Sierra Club v. Gorsuch*, 230 U.S.App.D.C. 179, 184, 715 F.2d 653, 658 (1983).

150. *Id.* at 184–185, 715 F.2d at 658–659; *Natural Resources Defense Council v. SEC*, 196 U.S.App. D.C. 124, 149, 606 F.2d 1031, 1056 (1979) (agency "alone is cognizant of the many demands on it, its limited resources, and the most effective structuring and timing of proceedings to resolve those competing demands"); *National Congress of Hispanic Am. Citizens v. Usery*, 180 U.S.App. D.C. 337, 341, 554 F.2d 1196, 1200 (1977).

151. The APA imposes a judicially-enforceable duty to proceed with reasonable dispatch. See generally, *Deering Milliken, Inc. v. Johnston, supra* note 137, 295 F.2d at 866. That obligation may derive directly from the underlying statute as well. See, e.g., *Potomac Elec. Power Co. v. ICC, supra* note 137, 226 U.S.App.D.C. at 297, 702 F.2d at 1034; *Natural Resources Defense*

possible agency decisionmaking into future plans." [152] Moreover, unjustifiable delay may undermine the statutory scheme [153] and could inflict harm on individuals in need of final action. In some cases, agency delay may collide with the right to judicial review. [154]

Our cases identify a number of factors that aid in determining whether an agency's foot-dragging constitutes unreasonable delay. [155] First, the court should

ascertain the length of time that has elapsed since the agency came under a duty to act, and should evaluate any prospect of early completion. [156] Next, "[t]he reasonableness of the delay must be judged 'in the context of the statute' which authorizes the agency's action." [157] This entails an examination of any legislative mandate in the statute and the degree of discretion given the agency by Congress. [158] The court must also estimate the extent to

Council v. Train, 166 U.S.App.D.C. 312, 325, 510 F.2d 692, 705 (1974).

**152.** *Potomac Elec. Power Co. v. ICC, supra* note 137, 226 U.S.App.D.C. at 297, 702 F.2d at 1034 (quoting *MCI Telecommunications Corp. v. FCC, supra* note 137, 200 U.S.App.D.C. at 287, 627 F.2d at 340). Accord, *Public Citizen Health Research Group v. Commissioner, supra* note 92, 238 U.S.App.D.C. at 282, 740 F.2d at 32.

**153.** See notes 134–140 *infra* and accompanying text.

**154.** See, e.g., *Sierra Club v. Gorsuch, supra* note 149, 230 U.S.App.D.C. at 185, 715 F.2d at 659 ("judicial review of decisions not to regulate must not be frustrated by *blind* acceptance of an agency's claim that a decision is still under study") (emphasis in original); *Environmental Defense Fund, Inc. v. Hardin,* 138 U.S.App.D.C. 391, 397, 428 F.2d 1093, 1099 (1970) ("when administrative inaction has precisely the same impact on the rights of the parties as denial of relief, an agency cannot preclude judicial review by casting its decision in the form of inaction rather than in the form of an order denying relief"); *American Broadcasting Co. v. FCC,* 89 U.S.App.D.C. 298, 307, 191 F.2d 492, 501 (1951) ("[t]he Commission cannot, by its delay, substantially nullify rights which the Act confers, though it preserves them in form").

**155.** See, e.g., *Telecommunications Research & Action Center v. FCC, supra* note 61, 242 U.S. App.D.C. at 229–230, 750 F.2d at 77–78.

**156.** See, e.g., *Nader v. FCC, supra* note 137, 172 U.S.App.D.C. at 25, 520 F.2d at 206. There we stated that "'nine years should be enough time for any agency to decide almost any issue. There comes a point when relegating issues to proceedings that go on without conclusion in any kind of reasonable time frame is tantamount to refusing to address the issues at all— and the result is a denial of justice,'" *Id.* (quoting MCI Reply Brief at 8–9). We did not, however, intend to create a *per se* rule limiting agency action to nine years, but rather meant to express our concern that inordinate agency delay would frustrate congressional intent by forcing a breakdown of regulatory processes. See 172 U.S.App.D.C. at 25–26, 520 F.2d at 206–207.

**157.** *Public Citizen Health Group v. Auchter, supra* note 137, 226 U.S.App.D.C. at 421 n. 30, 702 F.2d at 1158 n. 30 (quoting *National Congress of Hispanic Am. Citizens v. Marshall,* 200 U.S.App. D.C. 18, 24, 626 F.2d 882, 888 (1979) ). Accord, *Public Citizen Health Research Group v. Commissioner, supra* note 92, 238 U.S.App.D.C. at 284, 740 F.2d at 34.

**158.** In *Heckler v. Day,* 467 U.S. 104, 104 S.Ct. 2249, 81 L.Ed.2d 88 (1984), the Supreme Court held invalid an injunction, issued on behalf of a statewide class, requiring all future social security disability claims to be adjudicated according to judicially-established deadlines. In doing so, the Court was persuaded by extensive legislative history rejecting mandatory deadlines for resolution of disputed disability claims. *Id.* at 111– 116, 104 S.Ct. at 2254–2256, 81 L.Ed.2d at 96– 100. In the face of such a strong showing of congressional intent, the Court declined to sanction use of the traditional equity power to impose deadlines to prevent future delays. *Id.* at 119, 104 S.Ct. at 2258, 81 L.Ed.2d at 101. That, the Court believed, would be "an unwarranted judicial intrusion into this pervasively regulated area." *Id.*

Since the injunction in *Heckler v. Day* was predicated on the District Court's view that the Department of Health and Human Services had infringed the claimant's statutory rights under 42 U.S.C. § 405(b) (1982), 467 U.S. at 108, 104 S.Ct. at 2252, 81 L.Ed.2d at 94, neither that court nor the Supreme Court reached the question whether the agency's action constituted unreasonable delay under the APA. See *id.* at 110 n. 13, 104 S.Ct. at 2253, n. 13, 81 L.Ed.2d at 95 n. 13. Yet the Supreme's Court's stern counsel against judicial imposition of mandatory deadlines, where legislative history strongly indicates congressional repudiation of them, clearly applies to delay claims under the APA. We note, however, that the legislative history of the FDC Act contains no discussion of the OTC drug review since this program was wholly devised and implemented by FDA. See notes 20–21 *supra* and accompanying text. Given this fact, we must, in divining congressional intent regarding deadlines for enforcing the FDC Act's GRAS/E requirements, seek guidance from the scheme and purposes of the Act. See note 115 *supra* and accompanying text.

which delay may be undermining the statutory scheme, either by frustrating the statutory goal [159] or by creating a situation in which the agency is "losing its ability to effectively regulate at all." [160]

▮▮▮▮ Third, and perhaps most critically, the court must examine the consequences of the agency's delay. The deference traditionally accorded an agency to develop its own schedule is sharply reduced when injury likely will result from avoidable delay. Economic harm is clearly an important consideration and will, in some cases, justify court intervention,[161] and "[d]elays that might be altogether reasonable in the sphere of economic regulation are less tolerable when human lives are at stake." [162] Lack of alternative means of eliminating or reducing the hazard necessarily adds to unreasonableness of a delay.[163]

▮▮▮▮ The agency must justify its delay to the court's satisfaction. If the court determines that the agency delays in bad faith, it should conclude that the delay is unreasonable.[164] If the court finds an absence of bad faith, it should then consider the agency's explanation, such as administrative necessity, insufficient resources, or the complexity of the task confronting the agency. Although complexity bears on avoidance in ascertaining reasonableness, it is not always sufficient to justify lengthy delays.[165] And if an agency's failure to proceed expeditiously will result in harm or substantial nullification of a right conferred by statute, "the courts must act to make certain that what can be done is done." [166] The court should weigh any plea of administrative error, administrative convenience, practical difficulty in carrying out a legislative mandate, or need to prioritize in the face of limited resources.[167] Of course, these justifications become less persuasive as delay progresses, and must always be balanced against the potential for harm.

▮▮▮▮ On remand, then, the District Court should scrutinize FDA's justifications for delay in completing the OTC drug

---

**159.** See, e.g., *In re: Center for Auto Safety*, 253 U.S.App.D.C. 360, 368 n. 55, 793 F.2d 1346, 1354 n. 55 (1986) ("[r]ather than single, unitary rulemakings undertaken as a matter of agency discretion, we deal here with statutorily mandated annual rulemakings beset with repeated delay"); *Public Citizen Health Research Group v. Auchter, supra* note 137, 226 U.S.App.D.C. at 421 n. 30, 702 F.2d at 1158 n. 30 ("in the context of the OSH Act, designed to protect workers' health ..., the Assistant Secretary's protracted course in face of potentially grave health risks cannot be characterized as reasonable").

**160.** *Nader v. FCC, supra* note 137, 172 U.S.App. D.C. at 26, 520 F.2d at 207.

**161.** See, e.g., *MCI Telecommunications Corp. v. FCC, supra* note 137, 200 U.S.App.D.C. at 288–289, 627 F.2d at 341–342; *Nader v. FCC, supra* note 137, 172 U.S.App.D.C. at 25, 520 F.2d at 206; *American Broadcasting Co. v. FCC, supra* note 154, 89 U.S.App.D.C. at 307, 191 F.2d at 501.

**162.** *Public Citizen Health Research Group v. Auchter, supra* note 137, 226 U.S.App.D.C. at 420, 702 F.2d at 1157. Accord, *Air Line Pilots Ass'n v. CAB*, 242 U.S.App.D.C. 233, 238, 750 F.2d 81, 86 (1984); *Public Citizen Health Research Group v. Commissioner, supra* note 92, 238 U.S.App. D.C. at 284, 740 F.2d at 34; *Public Citizen Health Research Group v. Auchter, supra* note 137, 226 U.S.App.D.C. at 420–421 n. 26, 702 F.2d at 1157–

1158 n. 26 ("[t]he risk to human life need not be a certainty to justify expedition").

**163.** See *MCI Telecommunications Corp. v. FCC, supra* note 137, 200 U.S.App.D.C. at 289, 627 F.2d at 342; see also *GTE Serv. Corp. v. FCC*, 251 U.S.App.D.C. 181, 192, 782 F.2d 263, 274 (1986).

**164.** See, e.g., *National Congress of Hispanic Am. Citizens v. Marshall, supra* note 157, 200 U.S. App.D.C. at 26, 626 F.2d at 890.

**165.** See *American Broadcasting Co. v. FCC, supra* note 154, 89 U.S.App.D.C. at 307, 191 F.2d at 501.

**166.** *Id.*

**167.** See, e.g., *MCI Telecommunications Corp. v. FCC, supra* note 137, 200 U.S.App.D.C. at 292, 627 F.2d at 345 (change in circumstances and inception of related proceedings); *National Congress of Hispanic Am. Citizens v. Marshall, supra* note 157, 200 U.S.App.D.C. at 25, 626 F.2d at 889 (resource allocation). Cf. *Public Citizen v. Schmidt*, 1976 Food Drug Cosm. L.Rep. (CCH) ¶ 38,075 (D.D.C.1976) (practical considerations such as limited resources and varied responsibilities support FDA's decision to require replacement of chloroform products rather than a ban).

review [168] and balance them against the consequences ensuing.[169] The court must examine the delay in the context of the FDC Act and in harmony with the principles articulated herein. And it goes without saying that this time the court will bear in mind that the OTC drug review is not a voluntary program for these purposes.[170]

## VII. THE CATEGORY III REGULATORY SCHEME

Lastly, appellants attack as inconsistent with the FDC Act and the District Court's decision in *Cutler v. Kennedy*,[171] the amendment to the OTC drug review regulations creating a period for comment on temporary final monographs. This amendment eliminated the marketing period for Category III drugs after formulation of the final monograph,[172] but added a twelve-month period following publication of the tentative final monograph for interested persons to present "new data and information to support a condition excluded from the monograph in the tentative order." [173] *Cutler v. Kennedy* held that a prior version of the regulations, which permitted marketing of drugs classified by final monograph in Category III to continue during ongoing product-testing,[174] contravened congressional intent because Category III drugs by definition were not generally recognized as safe and effective.[175]

Appellants argue that the newly-added twelve-month period for submitting additional information bearing on tentative final monographs [176] serves only to delay implementation of the Act's safety and efficacy requirements by further postponing publication of final monographs, and, in effect, to sanction the impermissible marketing of Category III drugs at an earlier stage in the process.[177] FDA, on the other

168. See Brief for Appellees at 25–32.

169. Should, on remand, the District Court conclude that FDA, by failing to make adequate progress in completing the OTC drug review, has delayed unreasonably, the court must determine whether a remedy can be fashioned to effectively redress appellants' concerns. Two factors are relevant to this determination: how much work the agency has yet to do, and how long it should take for the work to be done. The District Court may find it appropriate, after hearing all parties, to impose a binding timetable upon FDA for completion of the program. Cf. *MCI Telecommunications v. FCC, supra* note 137, 200 U.S.App.D.C. at 292, 627 F.2d at 345; *American Pub. Health Ass'n v. Veneman, supra* note 16, 349 F.Supp. at 1317. See also *Oil, Chem., & Atomic Workers Int'l v. Zegeer, supra* note 138, 248 U.S.App.D.C. at 55, 768 F.2d at 1488.

170. See notes 132–135 *supra* and accompanying text.

171. *Supra* note 17.

172. The final monograph now lists only those drugs deemed generally recognized as safe and effective, and the conditions under which they must be utilized. 21 C.F.R. § 330.10(a)(9) (1986).

173. *Id.* § 330.10(a)(7)(iii).

174. *Cutler v. Kennedy, supra* note 17, 475 F.Supp. at 855. The previous regulations had provided that Category III drugs "may remain on the market or may be introduced into the market" as long as the required testing contin-

ued. 21 C.F.R. § 330.10(a)(13)(i) (1981); see *Cutler v. Kennedy, supra* note 17, 475 F.Supp. at 855 n. 42.

175. See note 32 *supra* and accompanying text.

176. 21 C.F.R. § 330.10(a)(7) (1986).

177. Brief for Appellants at 50–51 (comparing regulation here challenged with scheme prohibited in *Cutler v. Kennedy, supra* note 17). Appellants also charge that the twelve-month open-record period serves no legitimate purpose, and in reality constitutes a vehicle for violations of the Act, since it will be used only to accept the results of new tests on efficacy and safety. Brief for Appellants at 53. This is clearly prohibited, since " 'the Act is designed so that drugs on the market ... will have mustered the requisite scientifically reliable evidence of effectiveness long before they are in a position to drop out of active regulation by ceasing to be a "new drug." ' " *Weinberger v. Hynson, Westcott & Dunning, supra* note 14, 412 U.S. at 631, 93 S.Ct. at 2484, 37 L.Ed.2d at 224 (quoting Solicitor General). Accord, *Cutler v. Kennedy, supra* note 17, 475 F.Supp. at 852–853 n. 36.

FDA has insisted that this criticism of the open-record period misconstrues its purpose. Responding to the same argument, made in a public comment opposing the proposed amended regulation, FDA elucidated:

The comment incorrectly assumes that the 12-month period following the tentative final monograph is for the sole purpose of giving manufacturers additional time for testing to upgrade a condition to Category I status. Rather, that period is the fixed time during

hand, contends that the revised regulations are consistent with the Act since they no longer authorize any marketing of drugs that officially have been labeled not generally recognized as safe and effective.[178] FDA also asserts that this provision is unlikely to delay promulgation of final monographs since the twelve-month period will be used concurrently to prepare them.[179] Moreover, the agency declares, the regulations will merely hold the administrative record open during these twelve months, and thus avoid the immense drain on resources likely to occur if all who sought to present new information on a drug's Category III classification were required formally to petition for reopening of the record.[180]

The District Court held that FDA had complied with *Cutler v. Kennedy* by removing from its regulations language authorizing marketing of Category III drugs after promulgation of final monographs. The court further concluded that FDA had "proffered a reasonable justification for the interim testing period based on administrative necessity,"[181] and approved the new provision. We agree that the regulation as amended is in harmony both with *Cutler* and with the applicable law.[182] We therefore uphold the District Court's denial of appellants' request for declaratory relief.

We do not share appellants' expansive interpretation of *Cutler*. It is evident that there the first set of OTC regulations were condemned because they permitted continued marketing of Category III drugs after publication of final monographs.[183] By eliminating this marketing authorization, however, FDA has overcome the difficulty that was fatal in *Cutler*.

Nor do we perceive the current regulations as arbitrary, capricious, or otherwise inconsistent with the FDC Act.[184] The OTC review program in its present form does not sanction the marketing of OTC drugs during the twelve-month period for which the administrative record remains open.[185] Moreover, until publication of a final monograph, FDA makes no conclusive determination of a drug's GRAS/E status; rather, panel recommendations and tentative conclusions remain subject to reconsideration in light of any additional information submitted in timely fashion to the agency.[186] Moreover, the agency has presented reasonable justifications for adopting the twelve-month open-record period. FDA designed this procedure to facilitate gathering of supplemental information, including that which is often solicited by the agency from manufacturers. Leaving the record open for this period promotes efficiency since it eliminates the

which persons may submit data to the agency without petitioning to reopen the administrative record. These data may consist of additional data and information that FDA, either from informal meetings with manufacturers to discuss testing requirements or after a review of previously submitted data, has determined are necessary to upgrade a condition to Category I. In addition, manufacturers may submit new data from tests previously conducted.
46 Fed.Reg. 47,734 (1981). We find this explanation adequate, and therefore reject appellants' argument on this point.

178. Brief for Appellees at 34–35.

179. Brief for Appellees at 37–38. Accord, 46 Fed.Reg. 47,734 (1981) ("[t]he time necessary for the agency to conduct essential scientific and administrative review and evaluations that must be completed before a final rule is issued is at least 12 months.... These ... reviews and evaluations by the agency proceed on parallel, not sequential, tracks with the time permitted

for the submission of new data. Therefore, [this] ... will not, in the agency's judgment, delay the overall OTC drug review process").

180. Brief for Appellees at 34, 36–37. Under the previous regulations, any party wishing to submit new data following publication of the tentative monograph was required to petition for reopening of the administrative record. See 21 C.F.R. § 330.10(a)(10)(ii) (1981).

181. *Cutler v. Hayes, supra* note 24, 549 F.Supp. at 1346.

182. See 5 U.S.C. § 706(2)(A) (1982).

183. See *Cutler v. Kennedy, supra* note 17, 475 F.Supp. at 854–855.

184. See note 182 *supra*.

185. See 46 Fed.Reg. 47,734 (1981).

186. See *id.;* note 180 *supra*.

need to deal with the expectably large number of individual petitions to reopen the record,[187] and allows the agency simultaneously to evaluate the public comments, objections, and requests for hearings tendered after publication of the tentative final monographs.[188] We therefore conclude that FDA did not act arbitrarily or otherwise improperly when it amended its regulations on Category III drugs.

### VIII. CONCLUSION

In 1962, Congress ordained that only those drugs generally recognized as safe and effective could be marketed without premarketing clearance. Because, a quarter-century later, this mandate has not yet been fully satisfied, close scrutiny must be paid to appellants' claim that FDA has unreasonably delayed its completion of the OTC drug review program. For that purpose, we vacate the judgment of the District Court on the question of unreasonable delay and remand the case for reconsideration on that point. We affirm the judgment in all other respects.

*So Ordered.*

187. See 45 Fed.Reg. 31,423–31,424 (1980).

188. See *id.* at 31,424 ("[b]ased on the agency's experience with comments filed to Panel Reports and with the tentative final and final monographs published to date, the evaluation of the comments, objections, and requests for hearings will take at least as long as the fixed time period established for the submission of new data"). Appellants argue that the period for completing the OTC drug review will be further prolonged because the revised regulations provide for a sixty-day comment period to enable the public to respond to material submitted while the administrative record remained open. 21 C.F.R. § 330.10(a)(7)(iv) (1986); see Reply Brief for Appellants at 15. Given the unavoidable long-term nature of the OTC drug review in its entirety and the benefit derived from keeping the record open, we regard any slight delay created by the public comment period as *de minimis* and well within the bounds of reasonableness.